# BATSON *v.* KENTUCKY

No. 84–6263.   Argued December 12, 1985—Decided April 30, 1986

80

POWELL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., *post*, p. 100, and MARSHALL, J., *post*, p. 102, filed concurring opinions. STEVENS, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 108. O'CONNOR, J., filed a concurring opinion, *post*, p. 111. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 112. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 134.

*J. David Niehaus* argued the cause for petitioner. With him on the briefs were *Frank W. Heft, Jr.*, and *Daniel T. Goyette*.

*Rickie L. Pearson*, Assistant Attorney General of Kentucky, argued the cause for respondent. With him on the brief were *David L. Armstrong*, Attorney General, and *Carl T. Miller, Jr.*, Assistant Attorney General.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Fried, Assistant Attorney General Trott*, and *Sidney M. Glazer*.*

---

*Briefs of *amici curiae* urging reversal were filed for the NAACP Legal Defense and Educational Fund, Inc., by *Julius LeVonne Chambers, Charles Stephen Ralston, Steven L. Winter, Anthony G. Amsterdam*, and *Samuel Rabinove;* for the Lawyers' Committee for Civil Rights Under Law by *Barry Sullivan, Fred N. Fishman, Robert H. Kapp, Norman Redlich, William L. Robinson*, and *Norman J. Chachkin;* and for Michael McCray et al. by *Steven R. Shapiro*.

*Robert E. Weiss, Donald A. Kuebler, Robert J. Miller*, and *Jack E. Yelverton* filed a brief for the National District Attorneys Association, Inc., as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the National Legal Aid and Defender Association by *Patricia Unsinn;* and for Elizabeth Holtzman by *Elizabeth Holtzman, pro se*, and *Barbara D. Underwood*.

JUSTICE POWELL delivered the opinion of the Court.

This case requires us to reexamine that portion of *Swain* v. *Alabama,* 380 U. S. 202 (1965), concerning the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury.[1]

## I

Petitioner, a black man, was indicted in Kentucky on charges of second-degree burglary and receipt of stolen goods. On the first day of trial in Jefferson Circuit Court, the judge conducted *voir dire* examination of the venire, excused certain jurors for cause, and permitted the parties to

---

[1] Following the lead of a number of state courts construing their State's Constitution, two Federal Courts of Appeals recently have accepted the view that peremptory challenges used to strike black jurors in a particular case may violate the Sixth Amendment. *Booker* v. *Jabe,* 775 F. 2d 762 (CA6 1985), cert. pending, No. 85–1028; *McCray* v. *Abrams,* 750 F. 2d 1113 (CA2 1984), cert. pending, No. 84–1426. See *People* v. *Wheeler,* 22 Cal. 3d 258, 583 P. 2d 748 (1978); *Riley* v. *State,* 496 A. 2d 997, 1009–1013 (Del. 1985); *State* v. *Neil,* 457 So. 2d 481 (Fla. 1984); *Commonwealth* v. *Soares,* 377 Mass. 461, 387 N. E. 2d 499, cert. denied, 444 U. S. 881 (1979). See also *State* v. *Crespin,* 94 N. M. 486, 612 P. 2d 716 (App. 1980). Other Courts of Appeals have rejected that position, adhering to the requirement that a defendant must prove systematic exclusion of blacks from the petit jury to establish a constitutional violation. *United States* v. *Childress,* 715 F. 2d 1313 (CA8 1983) (en banc), cert. denied, 464 U. S. 1063 (1984); *United States* v. *Whitfield,* 715 F. 2d 145, 147 (CA4 1983). See *Beed* v. *State,* 271 Ark. 526, 530–531, 609 S. W. 2d 898, 903 (1980); *Blackwell* v. *State,* 248 Ga. 138, 281 S. E. 2d 599, 599–600 (1981); *Gilliard* v. *State,* 428 So. 2d 576, 579 (Miss.), cert. denied, 464 U. S. 867 (1983); *People* v. *McCray,* 57 N. Y. 2d 542, 546–549, 443 N. E. 2d 915, 916–919 (1982), cert. denied, 461 U. S. 961 (1983); *State* v. *Lynch,* 300 N. C. 534, 546–547, 268 S. E. 2d 161, 168–169 (1980). Federal Courts of Appeals also have disagreed over the circumstances under which supervisory power may be used to scrutinize the prosecutor's exercise of peremptory challenges to strike blacks from the venire. Compare *United States* v. *Leslie,* 783 F. 2d 541 (CA5 1986) (en banc), with *United States* v. *Jackson,* 696 F. 2d 578, 592–593 (CA8 1982), cert. denied, 460 U. S. 1073 (1983). See also *United States* v. *McDaniels,* 379 F. Supp. 1243 (ED La. 1974).

exercise peremptory challenges.[2] The prosecutor used his peremptory challenges to strike all four black persons on the venire, and a jury composed only of white persons was selected. Defense counsel moved to discharge the jury before it was sworn on the ground that the prosecutor's removal of the black veniremen violated petitioner's rights under the Sixth and Fourteenth Amendments to a jury drawn from a cross section of the community, and under the Fourteenth Amendment to equal protection of the laws. Counsel requested a hearing on his motion. Without expressly ruling on the request for a hearing, the trial judge observed that the parties were entitled to use their peremptory challenges to "strike anybody they want to." The judge then denied petitioner's motion, reasoning that the cross-section requirement applies only to selection of the venire and not to selection of the petit jury itself.

The jury convicted petitioner on both counts. On appeal to the Supreme Court of Kentucky, petitioner pressed, among other claims, the argument concerning the prosecutor's use of peremptory challenges. Conceding that *Swain* v. *Alabama, supra,* apparently foreclosed an equal protection claim based solely on the prosecutor's conduct in this case, petitioner urged the court to follow decisions of other States, *People* v. *Wheeler,* 22 Cal. 3d 258, 583 P. 2d 748 (1978); *Commonwealth* v. *Soares,* 377 Mass. 461, 387 N. E. 2d 499, cert. denied, 444 U. S. 881 (1979), and to hold that such conduct violated his rights under the Sixth Amendment and § 11 of the Kentucky Constitution to a jury drawn from a cross section of the community. Petitioner also contended

---

[2] The Kentucky Rules of Criminal Procedure authorize the trial court to permit counsel to conduct *voir dire* examination or to conduct the examination itself. Ky. Rule Crim. Proc. 9.38. After jurors have been excused for cause, the parties exercise their peremptory challenges simultaneously by striking names from a list of qualified jurors equal to the number to be seated plus the number of allowable peremptory challenges. Rule 9.36. Since the offense charged in this case was a felony, and an alternate juror was called, the prosecutor was entitled to six peremptory challenges, and defense counsel to nine. Rule 9.40.

that the facts showed that the prosecutor had engaged in a "pattern" of discriminatory challenges in this case and established an equal protection violation under *Swain*.

The Supreme Court of Kentucky affirmed. In a single paragraph, the court declined petitioner's invitation to adopt the reasoning of *People* v. *Wheeler, supra,* and *Commonwealth* v. *Soares, supra.* The court observed that it recently had reaffirmed its reliance on *Swain*, and had held that a defendant alleging lack of a fair cross section must demonstrate systematic exclusion of a group of jurors from the venire. See *Commonwealth* v. *McFerron*, 680 S. W. 2d 924 (1984). We granted certiorari, 471 U. S. 1052 (1985), and now reverse.

II

In *Swain* v. *Alabama*, this Court recognized that a "State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." 380 U. S., at 203–204. This principle has been "consistently and repeatedly" reaffirmed, *id.*, at 204, in numerous decisions of this Court both preceding and following *Swain*.[3] We reaffirm the principle today.[4]

---

[3] See, *e. g., Strauder* v. *West Virginia,* 100 U. S. 303 (1880); *Neal* v. *Delaware,* 103 U. S. 370 (1881); *Norris* v. *Alabama,* 294 U. S. 587 (1935); *Hollins* v. *Oklahoma,* 295 U. S. 394 (1935) *(per curiam); Pierre* v. *Louisiana,* 306 U. S. 354 (1939); *Patton* v. *Mississippi,* 332 U. S. 463 (1947); *Avery* v. *Georgia,* 345 U. S. 559 (1953); *Hernandez* v. *Texas,* 347 U. S. 475 (1954); *Whitus* v. *Georgia,* 385 U. S. 545 (1967); *Jones* v. *Georgia,* 389 U. S. 24 (1967) *(per curiam); Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320 (1970); *Castaneda* v. *Partida,* 430 U. S. 482 (1977); *Rose* v. *Mitchell,* 443 U. S. 545 (1979); *Vasquez* v. *Hillery,* 474 U. S. 254 (1986).

The basic principles prohibiting exclusion of persons from participation in jury service on account of their race "are essentially the same for grand juries and for petit juries." *Alexander* v. *Louisiana,* 405 U. S. 625, 626, n. 3 (1972); see *Norris* v. *Alabama, supra,* at 589. These principles are reinforced by the criminal laws of the United States. 18 U. S. C. § 243.

[4] In this Court, petitioner has argued that the prosecutor's conduct violated his rights under the Sixth and Fourteenth Amendments to an impartial jury and to a jury drawn from a cross section of the community. Peti-

## A

More than a century ago, the Court decided that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded. *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). That decision laid the foundation for the Court's unceasing efforts to eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn. In *Strauder*, the Court explained that the central concern of the recently ratified Fourteenth Amendment was to put an end to governmental discrimination on account of race. *Id.*, at 306–307. Exclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure.

In holding that racial discrimination in jury selection offends the Equal Protection Clause, the Court in *Strauder* recognized, however, that a defendant has no right to a "petit jury composed in whole or in part of persons of his own race." *Id.*, at 305.[5] "The number of our races and nationalities stands in the way of evolution of such a conception" of the demand of equal protection. *Akins* v. *Texas*, 325 U. S. 398, 403 (1945).[6] But the defendant does have the right to be

tioner has framed his argument in these terms in an apparent effort to avoid inviting the Court directly to reconsider one of its own precedents. On the other hand, the State has insisted that petitioner is claiming a denial of equal protection and that we must reconsider *Swain* to find a constitutional violation on this record. We agree with the State that resolution of petitioner's claim properly turns on application of equal protection principles and express no view on the merits of any of petitioner's Sixth Amendment arguments.

[5] See *Hernandez* v. *Texas, supra*, at 482; *Cassell* v. *Texas*, 339 U. S. 282, 286–287 (1950) (plurality opinion); *Akins* v. *Texas*, 325 U. S. 398, 403 (1945); *Martin* v. *Texas*, 200 U. S. 316, 321 (1906); *Neal* v. *Delaware, supra*, at 394.

[6] Similarly, though the Sixth Amendment guarantees that the petit jury will be selected from a pool of names representing a cross section of the community, *Taylor* v. *Louisiana*, 419 U. S. 522 (1975), we have never held

tried by a jury whose members are selected pursuant to non-discriminatory criteria. *Martin* v. *Texas,* 200 U. S. 316, 321 (1906); *Ex parte Virginia,* 100 U. S. 339, 345 (1880). The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, *Strauder, supra,* at 305,[7] or on the false assumption that members of his race as a group are not qualified to serve as jurors, see *Norris* v. *Alabama,* 294 U. S. 587, 599 (1935); *Neal* v. *Delaware,* 103 U. S. 370, 397 (1881).

Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure. "The very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." *Strauder, supra,* at 308; see *Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320, 330 (1970). The petit jury has occupied a central position in our system of justice by safeguarding a person accused of crime against the arbitrary exercise of power by prosecutor or judge. *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968).[8] Those on the ve-

---

that the Sixth Amendment requires that "petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population," *id.,* at 538. Indeed, it would be impossible to apply a concept of proportional representation to the petit jury in view of the heterogeneous nature of our society. Such impossibility is illustrated by the Court's holding that a jury of six persons is not unconstitutional. *Williams* v. *Florida,* 399 U. S. 78, 102–103 (1970).

[7] See *Hernandez* v. *Texas, supra,* at 482; *Cassell* v. *Texas, supra,* at 287; *Akins* v. *Texas, supra,* at 403; *Neal* v. *Delaware, supra,* at 394.

[8] See *Taylor* v. *Louisiana, supra,* at 530; *Williams* v. *Florida, supra,* at 100. See also Powell, Jury Trial of Crimes, 23 Wash. & Lee L. Rev. 1 (1966).

In *Duncan* v. *Louisiana,* decided after *Swain,* the Court concluded that the right to trial by jury in criminal cases was such a fundamental feature of the American system of justice that it was protected against state action

nire must be "indifferently chosen,"[9] to secure the defendant's right under the Fourteenth Amendment to "protection of life and liberty against race or color prejudice." *Strauder, supra,* at 309.

Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. See *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 223–224 (1946). A person's race simply "is unrelated to his fitness as a juror." *Id.,* at 227 (Frankfurter, J., dissenting). As long ago as *Strauder,* therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror. 100 U. S., at 308; see *Carter* v. *Jury Comm'n of Greene County, supra,* at 329–330; *Neal* v. *Delaware, supra,* at 386.

The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. See *Ballard* v. *United States,* 329 U. S. 187, 195 (1946); *McCray* v. *New York,* 461 U. S. 961, 968 (1983) (MARSHALL, J., dissenting from denial of certiorari). Discrimination within the

---

by the Due Process Clause of the Fourteenth Amendment. 391 U. S., at 147–158. The Court emphasized that a defendant's right to be tried by a jury of his peers is designed "to prevent oppression by the Government." *Id.,* at 155, 156–157. For a jury to perform its intended function as a check on official power, it must be a body drawn from the community. *Id.,* at 156; *Glasser* v. *United States,* 315 U. S. 60, 86–88 (1942). By compromising the representative quality of the jury, discriminatory selection procedures make "juries ready weapons for officials to oppress those accused individuals who by chance are numbered among unpopular or inarticulate minorities." *Akins* v. *Texas, supra,* at 408 (Murphy, J., dissenting).

[9] 4 W. Blackstone, Commentaries 350 (Cooley ed. 1899) (quoted in *Duncan* v. *Louisiana,* 391 U. S., at 152).

judicial system is most pernicious because it is "a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others." *Strauder*, 100 U. S., at 308.

## B

In *Strauder*, the Court invalidated a state statute that provided that only white men could serve as jurors. *Id.*, at 305. We can be confident that no State now has such a law. The Constitution requires, however, that we look beyond the face of the statute defining juror qualifications and also consider challenged selection practices to afford "protection against action of the State through its administrative officers in effecting the prohibited discrimination." *Norris* v. *Alabama, supra,* at 589; see *Hernandez* v. *Texas*, 347 U. S. 475, 478–479 (1954); *Ex parte Virginia, supra,* at 346–347. Thus, the Court has found a denial of equal protection where the procedures implementing a neutral statute operated to exclude persons from the venire on racial grounds,[10] and has made clear that the Constitution prohibits all forms of purposeful racial discrimination in selection of jurors.[11] While decisions of this Court have been concerned largely with discrimination during selection of the venire, the principles announced there also forbid discrimination on account of race in selection of the petit jury. Since the Fourteenth Amendment protects an accused throughout the proceedings bringing him to justice, *Hill* v. *Texas*, 316 U. S. 400, 406 (1942), the State may not draw up its jury lists pursuant to neutral procedures but then resort to discrimination at "other stages in the selection process," *Avery* v. *Georgia*, 345 U. S. 559, 562 (1953); see *McCray* v. *New York, supra,* at 965, 968

---

[10] *E. g., Sims* v. *Georgia*, 389 U. S. 404, 407 (1967) *(per curiam); Whitus* v. *Georgia*, 385 U. S., at 548–549; *Avery* v. *Georgia*, 345 U. S., at 561.

[11] See *Norris* v. *Alabama*, 294 U. S., at 589; *Martin* v. *Texas*, 200 U. S., at 319; *Neal* v. *Delaware*, 103 U. S., at 394, 397.

(MARSHALL, J., dissenting from denial of certiorari); see also *Alexander* v. *Louisiana*, 405 U. S. 625, 632 (1972).

Accordingly, the component of the jury selection process at issue here, the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause.[12] Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges "for any reason at all, as long as that reason is related to his view concerning the outcome" of the case to be tried, *United States* v. *Robinson*, 421 F. Supp. 467, 473 (Conn. 1976), mandamus granted *sub nom. United States* v. *Newman*, 549 F. 2d 240 (CA2 1977), the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.

## III

The principles announced in *Strauder* never have been questioned in any subsequent decision of this Court.

---

[12] We express no views on whether the Constitution imposes any limit on the exercise of peremptory challenges by defense counsel.

Nor do we express any views on the techniques used by lawyers who seek to obtain information about the community in which a case is to be tried, and about members of the venire from which the jury is likely to be drawn. See generally J. Van Dyke, Jury Selection Procedures: Our Uncertain Commitment to Representative Panels 183–189 (1977). Prior to *voir dire* examination, which serves as the basis for exercise of challenges, lawyers wish to know as much as possible about prospective jurors, including their age, education, employment, and economic status, so that they can ensure selection of jurors who at least have an open mind about the case. In some jurisdictions, where a pool of jurors serves for a substantial period of time, see *id.*, at 116–118, counsel also may seek to learn which members of the pool served on juries in other cases and the outcome of those cases. Counsel even may employ professional investigators to interview persons who have served on a particular petit jury. We have had no occasion to consider particularly this practice. Of course, counsel's effort to obtain possibly relevant information about prospective jurors is to be distinguished from the practice at issue here.

Rather, the Court has been called upon repeatedly to review the application of those principles to particular facts.[13]   A recurring question in these cases, as in any case alleging a violation of the Equal Protection Clause, was whether the defendant had met his burden of proving purposeful discrimination on the part of the State.   *Whitus* v. *Georgia*, 385 U. S. 545, 550 (1967); *Hernandez* v. *Texas, supra*, at 478–481; *Akins* v. *Texas*, 325 U. S., at 403–404; *Martin* v. *Texas*, 200 U. S. 316 (1906).   That question also was at the heart of the portion of *Swain* v. *Alabama* we reexamine today.[14]

## A

*Swain* required the Court to decide, among other issues, whether a black defendant was denied equal protection by the State's exercise of peremptory challenges to exclude members of his race from the petit jury.   380 U. S., at 209–210.   The record in *Swain* showed that the prosecutor

---

[13] See, *e. g.*, *Vasquez* v. *Hillery*, 474 U. S. 254 (1986); *Rose* v. *Mitchell*, 443 U. S. 545 (1979); *Castaneda* v. *Partida*, 430 U. S. 482 (1977); *Alexander* v. *Louisiana*, 405 U. S., at 628–629; *Whitus* v. *Georgia, supra*, at 549–550; *Swain* v. *Alabama*, 380 U. S. 202, 205 (1965); *Coleman* v. *Alabama*, 377 U. S. 129 (1964); *Norris* v. *Alabama, supra*, at 589; *Neal* v. *Delaware, supra*, at 394.

[14] The decision in *Swain* has been the subject of extensive commentary. Some authors have argued that the Court should reconsider the decision. *E. g.*, Van Dyke, *supra*, at 166–167; Imlay, Federal Jury Reformation: Saving a Democratic Institution, 6 Loyola (LA) L. Rev. 247, 268–270 (1973); Kuhn, Jury Discrimination: The Next Phase, 41 S. Cal. L. Rev. 235, 283–303 (1968); Note, Rethinking Limitations on the Peremptory Challenge, 85 Colum. L. Rev. 1357 (1985); Note, Peremptory Challenge—Systematic Exclusion of Prospective Jurors on the Basis of Race, 39 Miss. L. J. 157 (1967); Comment, *Swain v. Alabama:* A Constitutional Blueprint for the Perpetuation of the All-White Jury, 52 Va. L. Rev. 1157 (1966). See also Johnson, Black Innocence and the White Jury, 83 Mich. L. Rev. 1611 (1985).

On the other hand, some commentators have argued that we should adhere to *Swain*.   See Saltzburg & Powers, Peremptory Challenges and the Clash Between Impartiality and Group Representation, 41 Md. L. Rev. 337 (1982).

had used the State's peremptory challenges to strike the six black persons included on the petit jury venire.. *Id.*, at 210. While rejecting the defendant's claim for failure to prove purposeful discrimination, the Court nonetheless indicated that the Equal Protection Clause placed some limits on the State's exercise of peremptory challenges. *Id.*, at 222–224.

The Court sought to accommodate the prosecutor's historical privilege of peremptory challenge free of judicial control, *id.*, at 214–220, and the constitutional prohibition on exclusion of persons from jury service on account of race, *id.*, at 222–224. While the Constitution does not confer a right to peremptory challenges, *id.*, at 219 (citing *Stilson* v. *United States*, 250 U. S. 583, 586 (1919)), those challenges traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury, 380 U. S., at 219.[15] To preserve the peremptory nature of the prosecutor's challenge, the Court in *Swain* declined to scrutinize his actions in a particular case by relying on a presumption that he properly exercised the State's challenges. *Id.*, at 221–222.

The Court went on to observe, however, that a State may not exercise its challenges in contravention of the Equal Protection Clause. It was impermissible for a prosecutor to use his challenges to exclude blacks from the jury "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny to blacks "the same right and opportunity to participate in the administration of justice enjoyed by the white population." *Id.*, at 224. Accordingly, a black defendant could make out a prima facie case of purposeful discrimination on proof that the peremptory challenge system was "being perverted" in that manner. *Ibid.* For example, an inference of purposeful discrimination would be raised on evidence that a prosecutor, "in case after case, whatever the

---

[15] In *Swain*, the Court reviewed the "very old credentials" of the peremptory challenge system and noted the "long and widely held belief that peremptory challenge is a necessary part of trial by jury." 380 U. S., at 219; see *id.*, at 212–219.

circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." *Id.*, at 223. Evidence offered by the defendant in *Swain* did not meet that standard. While the defendant showed that prosecutors in the jurisdiction had exercised their strikes to exclude blacks from the jury, he offered no proof of the circumstances under which prosecutors were responsible for striking black jurors beyond the facts of his own case. *Id.*, at 224–228.

A number of lower courts following the teaching of *Swain* reasoned that proof of repeated striking of blacks over a number of cases was necessary to establish a violation of the Equal Protection Clause.[16] Since this interpretation of *Swain* has placed on defendants a crippling burden of proof,[17] prosecutors' peremptory challenges are now largely immune

---

[16] *E. g.*, *United States* v. *Jenkins*, 701 F. 2d 850, 859–860 (CA10 1983); *United States* v. *Boykin*, 679 F. 2d 1240, 1245 (CA8 1982); *United States* v. *Pearson*, 448 F. 2d 1207, 1213–1218 (CA5 1971); *Thigpen* v. *State*, 49 Ala. App. 233, 241, 270 So. 2d 666, 673 (1972); *Jackson* v. *State*, 245 Ark. 331, 336, 432 S. W. 2d 876, 878 (1968); *Johnson* v. *State*, 9 Md. App. 143, 148–150, 262 A. 2d 792, 796–797 (1970); *State* v. *Johnson*, 125 N. J. Super. 438, 311 A. 2d 389 (1973) *(per curiam)*; *State* v. *Shaw*, 284 N. C. 366, 200 S. E. 2d 585 (1973).

[17] See *McCray* v. *Abrams*, 750 F. 2d, at 1120, and n. 2. The lower courts have noted the practical difficulties of proving that the State systematically has exercised peremptory challenges to exclude blacks from the jury on account of race. As the Court of Appeals for the Fifth Circuit observed, the defendant would have to investigate, over a number of cases, the race of persons tried in the particular jurisdiction, the racial composition of the venire and petit jury, and the manner in which both parties exercised their peremptory challenges. *United States* v. *Pearson*, 448 F. 2d 1207, 1217 (1971). The court believed this burden to be "most difficult" to meet. *Ibid.* In jurisdictions where court records do not reflect the jurors' race and where *voir dire* proceedings are not transcribed, the burden would be insurmountable. See *People* v. *Wheeler*, 22 Cal. 3d, at 285–286, 583 P. 2d, at 767–768.

from constitutional scrutiny. For reasons that follow, we reject this evidentiary formulation as inconsistent with standards that have been developed since *Swain* for assessing a prima facie case under the Equal Protection Clause.

## B

Since the decision in *Swain,* we have explained that our cases concerning selection of the venire reflect the general equal protection principle that the "invidious quality" of governmental action claimed to be racially discriminatory "must ultimately be traced to a racially discriminatory purpose." *Washington* v. *Davis,* 426 U. S. 229, 240 (1976). As in any equal protection case, the "burden is, of course," on the defendant who alleges discriminatory selection of the venire "to prove the existence of purposeful discrimination." *Whitus* v. *Georgia,* 385 U. S., at 550 (citing *Tarrance* v. *Florida,* 188 U. S. 519 (1903)). In deciding if the defendant has carried his burden of persuasion, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252, 266 (1977). Circumstantial evidence of invidious intent may include proof of disproportionate impact. *Washington* v. *Davis,* 426 U. S., at 242. We have observed that under some circumstances proof of discriminatory impact "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Ibid.* For example, "total or seriously disproportionate exclusion of Negroes from jury venires," *ibid.,* "is itself such an 'unequal application of the law . . . as to show intentional discrimination,'" *id.,* at 241 (quoting *Akins* v. *Texas,* 325 U. S., at 404).

Moreover, since *Swain,* we have recognized that a black defendant alleging that members of his race have been impermissibly excluded from the venire may make out a prima

facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. *Washington* v. *Davis, supra,* at 239–242. Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion. *Alexander* v. *Louisiana,* 405 U. S., at 632. The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties. See *Alexander* v. *Louisiana, supra,* at 632; *Jones* v. *Georgia,* 389 U. S. 24, 25 (1967). Rather, the State must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Alexander* v. *Louisiana, supra,* at 632; see *Washington* v. *Davis, supra,* at 241.[18]

The showing necessary to establish a prima facie case of purposeful discrimination in selection of the venire may be discerned in this Court's decisions. *E. g., Castaneda* v. *Partida,* 430 U. S. 482, 494–495 (1977); *Alexander* v. *Louisiana, supra,* at 631–632. The defendant initially must show that he is a member of a racial group capable of being singled out for differential treatment. *Castaneda* v. *Partida, supra,* at 494. In combination with that evidence, a defendant may then make a prima facie case by proving that in the particular jurisdiction members of his race have not been summoned for jury service over an extended period of time. *Id.,* at 494. Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the "result bespeaks discrimination." *Hernandez* v. *Texas,* 347

---

[18] Our decisions concerning "disparate treatment" under Title VII of the Civil Rights Act of 1964 have explained the operation of prima facie burden of proof rules. See *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973); *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248 (1981); *United States Postal Service Board of Governors* v. *Aikens,* 460 U. S. 711 (1983). The party alleging that he has been the victim of intentional discrimination carries the ultimate burden of persuasion. *Texas Dept. of Community Affairs* v. *Burdine, supra,* at 252–256.

U. S., at 482; see *Arlington Heights* v. *Metropolitan Housing Development Corp., supra*, at 266.

Since the ultimate issue is whether the State has discriminated in selecting the defendant's venire, however, the defendant may establish a prima facie case "in other ways than by evidence of long-continued unexplained absence" of members of his race "from many panels." *Cassell* v. *Texas*, 339 U. S. 282, 290 (1950) (plurality opinion). In cases involving the venire, this Court has found a prima facie case on proof that members of the defendant's race were substantially underrepresented on the venire from which his jury was drawn, and that the venire was selected under a practice providing "the opportunity for discrimination." *Whitus* v. *Georgia, supra*, at 552; see *Castaneda* v. *Partida, supra*, at 494; *Washington* v. *Davis, supra*, at 241; *Alexander* v. *Louisiana, supra*, at 629–631. This combination of factors raises the necessary inference of purposeful discrimination because the Court has declined to attribute to chance the absence of black citizens on a particular jury array where the selection mechanism is subject to abuse. When circumstances suggest the need, the trial court must undertake a "factual inquiry" that "takes into account all possible explanatory factors" in the particular case. *Alexander* v. *Louisiana, supra*, at 630.

Thus, since the decision in *Swain*, this Court has recognized that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case*. These decisions are in accordance with the proposition, articulated in *Arlington Heights* v. *Metropolitan Housing Development Corp.*, that "a consistent pattern of official racial discrimination" is not "a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions." 429 U. S., at 266, n. 14. For evidentiary require-

ments to dictate that "several must suffer discrimination" before one could object, *McCray* v. *New York*, 461 U. S., at 965 (MARSHALL, J., dissenting from denial of certiorari), would be inconsistent with the promise of equal protection to all.[19]

## C

The standards for assessing a prima facie case in the context of discriminatory selection of the venire have been fully articulated since *Swain.* See *Castaneda* v. *Partida, supra,* at 494–495; *Washington* v. *Davis,* 426 U. S., at 241–242; *Alexander* v. *Louisiana, supra,* at 629–631. These principles support our conclusion that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda* v. *Partida, supra,* at 494, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Avery* v. *Georgia,* 345 U. S., at 562. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circum-

---

[19] Decisions under Title VII also recognize that a person claiming that he has been the victim of intentional discrimination may make out a prima facie case by relying solely on the facts concerning the alleged discrimination against him. See cases in n. 18, *supra.*

stances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. See *McCray* v. *Abrams,* 750 F. 2d, at 1132; *Booker* v. *Jabe,* 775 F. 2d 762, 773 (CA6 1985), cert. pending, No. 85–1028. But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. Cf. *Norris* v. *Alabama,* 294 U. S., at 598–599; see *Thompson* v. *United States,* 469 U. S. 1024, 1026 (1984) (BRENNAN, J., dissenting from denial of certiorari). Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors, *supra,* at 86, so it forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of

98

such assumptions, which arise solely from the jurors' race. Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or "affirm[ing] [his] good faith in making individual selections." *Alexander* v. *Louisiana*, 405 U. S., at 632. If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause "would be but a vain and illusory requirement." *Norris* v. *Alabama, supra*, at 598. The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried.[20] The trial court then will have the duty to determine if the defendant has established purposeful discrimination.[21]

## IV

The State contends that our holding will eviscerate the fair trial values served by the peremptory challenge. Conceding that the Constitution does not guarantee a right to peremptory challenges and that *Swain* did state that their use ultimately is subject to the strictures of equal protection, the State argues that the privilege of unfettered exercise of the challenge is of vital importance to the criminal justice system.

While we recognize, of course, that the peremptory challenge occupies an important position in our trial procedures, we do not agree that our decision today will undermine the

---

[20] The Court of Appeals for the Second Circuit observed in *McCray* v. *Abrams*, 750 F. 2d, at 1132, that "[t]here are any number of bases" on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause. As we explained in another context, however, the prosecutor must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S., at 258.

[21] In a recent Title VII sex discrimination case, we stated that "a finding of intentional discrimination is a finding of fact" entitled to appropriate deference by a reviewing court. *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985). Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. *Id.*, at 575–576.

contribution the challenge generally makes to the administration of justice. The reality of practice, amply reflected in many state- and federal-court opinions, shows that the challenge may be, and unfortunately at times has been, used to discriminate against black jurors. By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice.[22] In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race.

Nor are we persuaded by the State's suggestion that our holding will create serious administrative difficulties. In those States applying a version of the evidentiary standard we recognize today, courts have not experienced serious administrative burdens,[23] and the peremptory challenge system has survived. We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges.[24]

---

[22] While we respect the views expressed in JUSTICE MARSHALL's concurring opinion concerning prosecutorial and judicial enforcement of our holding today, we do not share them. The standard we adopt under the Federal Constitution is designed to ensure that a State does not use peremptory challenges to strike any black juror because of his race. We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes. Certainly, this Court may assume that trial judges, in supervising *voir dire* in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination. Nor do we think that this historic trial practice, which long has served the selection of an impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution.

[23] For example, in *People* v. *Hall*, 35 Cal. 3d 161, 672 P. 2d 854 (1983), the California Supreme Court found that there was no evidence to show that procedures implementing its version of this standard, imposed five years earlier, were burdensome for trial judges.

[24] In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how

## V

In this case, petitioner made a timely objection to the prosecutor's removal of all black persons on the venire. Because the trial court flatly rejected the objection without requiring the prosecutor to give an explanation for his action, we remand this case for further proceedings. If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed. *E. g., Whitus* v. *Georgia,* 385 U. S., at 549–550; *Hernandez* v. *Texas,* 347 U. S., at 482; *Patton* v. *Mississippi,* 332 U. S., at 469.[25]

*It is so ordered.*

JUSTICE WHITE, concurring.

The Court overturns the principal holding in *Swain* v. *Alabama,* 380 U. S. 202 (1965), that the Constitution does not require in any given case an inquiry into the prosecutor's reasons for using his peremptory challenges to strike blacks from the petit jury panel in the criminal trial of a black defendant and that in such a case it will be presumed that the prosecutor is acting for legitimate trial-related reasons. The Court now rules that such use of peremptory challenges in a given case may, but does not necessarily, raise an inference, which the prosecutor carries the burden of refuting,

---

best to implement our holding today. For the same reason, we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case, see *Booker* v. *Jabe,* 775 F. 2d, at 773, or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire, see *United States* v. *Robinson,* 421 F. Supp. 467, 474 (Conn. 1976), mandamus granted *sub nom. United States* v. *Newman,* 549 F. 2d 240 (CA2 1977).

[25] To the extent that anything in *Swain* v. *Alabama,* 380 U. S. 202 (1965), is contrary to the principles we articulate today, that decision is overruled.

that his strikes were based on the belief that no black citizen could be a satisfactory juror or fairly try a black defendant.

I agree that, to this extent, *Swain* should be overruled. I do so because *Swain* itself indicated that the presumption of legitimacy with respect to the striking of black venire persons could be overcome by evidence that over a period of time the prosecution had consistently excluded blacks from petit juries.* This should have warned prosecutors that using peremptories to exclude blacks on the assumption that no black juror could fairly judge a black defendant would violate the Equal Protection Clause.

It appears, however, that the practice of peremptorily eliminating blacks from petit juries in cases with black defendants remains widespread, so much so that I agree that an opportunity to inquire should be afforded when this occurs. If the defendant objects, the judge, in whom the Court puts considerable trust, may determine that the prosecution must respond. If not persuaded otherwise, the judge may conclude that the challenges rest on the belief that blacks could not fairly try a black defendant. This, in effect, attributes to the prosecutor the view that all blacks should be eliminated from the entire venire. Hence, the Court's prior cases dealing with jury venires rather than petit juries are not without relevance in this case.

The Court emphasizes that using peremptory challenges to strike blacks does not end the inquiry; it is not unconstitutional, without more, to strike one or more blacks from the jury. The judge may not require the prosecutor to respond at all. If he does, the prosecutor, who in most cases has had a chance to *voir dire* the prospective jurors, will have an opportunity to give trial-related reasons for his strikes—

---

*Nor would it have been inconsistent with *Swain* for the trial judge to invalidate peremptory challenges of blacks if the prosecutor, in response to an objection to his strikes, stated that he struck blacks because he believed they were not qualified to serve as jurors, especially in the trial of a black defendant.

some satisfactory ground other than the belief that black jurors should not be allowed to judge a black defendant.

Much litigation will be required to spell out the contours of the Court's equal protection holding today, and the significant effect it will have on the conduct of criminal trials cannot be gainsaid. But I agree with the Court that the time has come to rule as it has, and I join its opinion and judgment.

I would, however, adhere to the rule announced in *DeStefano* v. *Woods*, 392 U. S. 631 (1968), that *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), which held that the States cannot deny jury trials in serious criminal cases, did not require reversal of a state conviction for failure to grant a jury trial where the trial began prior to the date of the announcement in the *Duncan* decision. The same result was reached in *DeStefano* with respect to the retroactivity of *Bloom* v. *Illinois*, 391 U. S. 194 (1968), as it was in *Daniel* v. *Louisiana*, 420 U. S. 31 (1975) *(per curiam)*, with respect to the decision in *Taylor* v. *Louisiana*, 419 U. S. 522 (1975), holding that the systematic exclusion of women from jury panels violated the Sixth and Fourteenth Amendments.

JUSTICE MARSHALL, concurring.

I join JUSTICE POWELL's eloquent opinion for the Court, which takes a historic step toward eliminating the shameful practice of racial discrimination in the selection of juries. The Court's opinion cogently explains the pernicious nature of the racially discriminatory use of peremptory challenges, and the repugnancy of such discrimination to the Equal Protection Clause. The Court's opinion also ably demonstrates the inadequacy of any burden of proof for racially discriminatory use of peremptories that requires that "justice . . . sit supinely by" and be flouted in case after case before a remedy is available.[1] I nonetheless write separately to express my views. The decision today will not end the racial discrimina-

---

[1] *Commonwealth* v. *Martin*, 461 Pa. 289, 299, 336 A. 2d 290, 295 (1975) (Nix, J., dissenting), quoted in *McCray* v. *New York*, 461 U. S. 961, 965, n. 2 (1983) (MARSHALL, J., dissenting from denial of certiorari).

tion that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely.

I

A little over a century ago, this Court invalidated a state statute providing that black citizens could not serve as jurors. *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). State officials then turned to somewhat more subtle ways of keeping blacks off jury venires. See *Swain* v. *Alabama*, 380 U. S. 202, 231–238 (1965) (Goldberg, J., dissenting); Kuhn, Jury Discrimination: The Next Phase, 41 S. Cal. L. Rev. 235 (1968); see also J. Van Dyke, Jury Selection Procedures: Our Uncertain Commitment to Representative Panels 155–157 (1977) (hereinafter Van Dyke). Although the means used to exclude blacks have changed, the same pernicious consequence has continued.

Misuse of the peremptory challenge to exclude black jurors has become both common and flagrant. Black defendants rarely have been able to compile statistics showing the extent of that practice, but the few cases setting out such figures are instructive. See *United States* v. *Carter*, 528 F. 2d 844, 848 (CA8 1975) (in 15 criminal cases in 1974 in the Western District of Missouri involving black defendants, prosecutors peremptorily challenged 81% of black jurors), cert. denied, 425 U. S. 961 (1976); *United States* v. *McDaniels*, 379 F. Supp. 1243 (ED La. 1974) (in 53 criminal cases in 1972–1974 in the Eastern District of Louisiana involving black defendants, federal prosecutors used 68.9% of their peremptory challenges against black jurors, who made up less than one-quarter of the venire); *McKinney* v. *Walker*, 394 F. Supp. 1015, 1017–1018 (SC 1974) (in 13 criminal trials in 1970–1971 in Spartansburg County, South Carolina, involving black defendants, prosecutors peremptorily challenged 82% of black jurors), affirmance order, 529 F. 2d 516 (CA4 1975).[2] Pros-

---

[2] See also *Harris* v. *Texas*, 467 U. S. 1261 (1984) (MARSHALL, J., dissenting from denial of certiorari); *Williams* v. *Illinois*, 466 U. S. 981 (1984) (MARSHALL, J., dissenting from denial of certiorari).

ecutors have explained to courts that they routinely strike black jurors, see *State* v. *Washington,* 375 So. 2d 1162, 1163–1164 (La. 1979). An instruction book used by the prosecutor's office in Dallas County, Texas, explicitly advised prosecutors that they conduct jury selection so as to eliminate "'any member of a minority group.'"[3] In 100 felony trials in Dallas County in 1983–1984, prosecutors peremptorily struck 405 out of 467 eligible black jurors; the chance of a qualified black sitting on a jury was 1 in 10, compared to 1 in 2 for a white.[4]

The Court's discussion of the utter unconstitutionality of that practice needs no amplification. This Court explained more than a century ago that "'in the selection of jurors to pass upon [a defendant's] life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them, because of their color.'" *Neal* v. *Delaware,* 103 U. S. 370, 394 (1881), quoting *Virginia* v. *Rives,* 100 U. S. 313, 323 (1880). JUSTICE REHNQUIST, dissenting, concedes that exclusion of blacks from a jury, solely because they are black, is at best based upon "crudely stereotypical and . . . in many cases hopelessly mistaken" notions. *Post,* at 138. Yet the Equal Protection Clause prohibits a State from taking any action based on crude, inaccurate racial stereotypes—even an action that does not serve the State's interests. Exclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than whites to consider fairly or sympathetically the State's case against a black defendant than it can be justified by the notion that blacks

---

[3] Van Dyke, at 152, quoting Texas Observer, May 11, 1973, p. 9, col. 2. An earlier jury-selection treatise circulated in the same county instructed prosecutors: "Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated." Quoted in Dallas Morning News, Mar. 9, 1986, p. 29, col. 1.

[4] *Id.,* at 1, col. 1; see also Comment, A Case Study of the Peremptory Challenge: A Subtle Strike at Equal Protection and Due Process, 18 St. Louis U. L. J. 662 (1974).

lack the "intelligence, experience, or moral integrity," *Neal, supra,* at 397, to be entrusted with that role.

## II

I wholeheartedly concur in the Court's conclusion that use of the peremptory challenge to remove blacks from juries, on the basis of their race, violates the Equal Protection Clause. I would go further, however, in fashioning a remedy adequate to eliminate that discrimination. Merely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge.

Evidentiary analysis similar to that set out by the Court, *ante,* at 97–98, has been adopted as a matter of state law in States including Massachusetts and California. Cases from those jurisdictions illustrate the limitations of the approach. First, defendants cannot attack the discriminatory use of peremptory challenges at all unless the challenges are so flagrant as to establish a prima facie case. This means, in those States, that where only one or two black jurors survive the challenges for cause, the prosecutor need have no compunction about striking them from the jury because of their race. See *Commonwealth* v. *Robinson,* 382 Mass. 189, 195, 415 N. E. 2d 805, 809–810 (1981) (no prima facie case of discrimination where defendant is black, prospective jurors include three blacks and one Puerto Rican, and prosecutor excludes one for cause and strikes the remainder peremptorily, producing all-white jury); *People* v. *Rousseau,* 129 Cal. App. 3d 526, 536–537, 179 Cal. Rptr. 892, 897–898 (1982) (no prima facie case where prosecutor peremptorily strikes only two blacks on jury panel). Prosecutors are left free to discriminate against blacks in jury selection provided that they hold that discrimination to an "acceptable" level.

Second, when a defendant can establish a prima facie case, trial courts face the difficult burden of assessing prosecutors' motives. See *King* v. *County of Nassau,* 581 F. Supp. 493,

501–502 (EDNY 1984). Any prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill equipped to second-guess those reasons. How is the court to treat a prosecutor's statement that he struck a juror because the juror had a son about the same age as defendant, see *People* v. *Hall,* 35 Cal. 3d 161, 672 P. 2d 854 (1983), or seemed "uncommunicative," *King, supra,* at 498, or "never cracked a smile" and, therefore "did not possess the sensitivities necessary to realistically look at the issues and decide the facts in this case," *Hall, supra,* at 165, 672 P. 2d, at 856? If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory.

Nor is outright prevarication by prosecutors the only danger here. "[I]t is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal." *King, supra,* at 502. A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is "sullen," or "distant," a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported. As JUSTICE REHNQUIST concedes, prosecutors' peremptories are based on their "seat-of-the-pants instincts" as to how particular jurors will vote. *Post,* at 138; see also THE CHIEF JUSTICE's dissenting opinion, *post,* at 123. Yet "seat-of-the-pants instincts" may often be just another term for racial prejudice. Even if all parties approach the Court's mandate with the best of conscious intentions, that mandate requires them to confront and overcome their own racism on all levels—a challenge I doubt all of them can meet. It is worth remembering that "114 years after the close of the War Between the States and nearly 100 years after *Strauder,* racial and other forms of discrimination still remain a fact of life, in the administration of justice as in

our society as a whole." *Rose* v. *Mitchell*, 443 U. S. 545, 558–559 (1979), quoted in *Vasquez* v. *Hillery*, 474 U. S. 254, 264 (1986).

## III

The inherent potential of peremptory challenges to distort the jury process by permitting the exclusion of jurors on racial grounds should ideally lead the Court to ban them entirely from the criminal justice system. See Van Dyke, at 167–169; Imlay, Federal Jury Reformation: Saving a Democratic Institution, 6 Loyola (LA) L. Rev. 247, 269–270 (1973). Justice Goldberg, dissenting in *Swain*, emphasized that "[w]ere it necessary to make an absolute choice between the right of a defendant to have a jury chosen in conformity with the requirements of the Fourteenth Amendment and the right to challenge peremptorily, the Constitution compels a choice of the former." 380 U. S., at 244. I believe that this case presents just such a choice, and I would resolve that choice by eliminating peremptory challenges entirely in criminal cases.

Some authors have suggested that the courts should ban prosecutors' peremptories entirely, but should zealously guard the defendant's peremptory as "essential to the fairness of trial by jury," *Lewis* v. *United States*, 146 U. S. 370, 376 (1892), and "one of the most important of the rights secured to the accused," *Pointer* v. *United States*, 151 U. S. 396, 408 (1894). See Van Dyke, at 167; Brown, McGuire, & Winters, The Peremptory Challenge as a Manipulative Device in Criminal Trials: Traditional Use or Abuse, 14 New England L. Rev. 192 (1978). I would not find that an acceptable solution. Our criminal justice system "requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held." *Hayes* v. *Missouri*, 120 U. S. 68, 70 (1887). We can maintain that balance, not by permitting both prosecutor and defendant to engage in racial discrimination in jury selection, but by banning the use of

peremptory challenges by prosecutors and by allowing the States to eliminate the defendant's peremptories as well.

Much ink has been spilled regarding the historic importance of defendants' peremptory challenges. The approving comments of the *Lewis* and *Pointer* Courts are noted above; the *Swain* Court emphasized the "very old credentials" of the peremptory challenge, 380 U. S., at 212, and cited the "long and widely held belief that peremptory challenge is a necessary part of trial by jury." *Id.*, at 219. But this Court has also repeatedly stated that the right of peremptory challenge is not of constitutional magnitude, and may be withheld altogether without impairing the constitutional guarantee of impartial jury and fair trial. *Frazier* v. *United States*, 335 U. S. 497, 505, n. 11 (1948); *United States* v. *Wood*, 299 U. S. 123, 145 (1936); *Stilson* v. *United States*, 250 U. S. 583, 586 (1919); see also *Swain*, 380 U. S., at 219. The potential for racial prejudice, further, inheres in the defendant's challenge as well. If the prosecutor's peremptory challenge could be eliminated only at the cost of eliminating the defendant's challenge as well, I do not think that would be too great a price to pay.

I applaud the Court's holding that the racially discriminatory use of peremptory challenges violates the Equal Protection Clause, and I join the Court's opinion. However, only by banning peremptories entirely can such discrimination be ended.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, concurring.

In his dissenting opinion, THE CHIEF JUSTICE correctly identifies an apparent inconsistency between my criticism of the Court's action in *Colorado* v. *Connelly*, 474 U. S. 1050 (1986) (memorandum of BRENNAN, J., joined by STEVENS, J.), and *New Jersey* v. *T. L. O.*, 468 U. S. 1214 (1984) (STEVENS, J., dissenting)—cases in which the Court directed the State to brief and argue questions not presented in its petition

for certiorari—and our action today in finding a violation of the Equal Protection Clause despite the failure of petitioner's counsel to rely on that ground of decision. *Post*, at 115–116, nn. 1 and 2. In this case, however—unlike *Connelly* and *T. L. O.*—the party defending the judgment has explicitly rested on the issue in question as a controlling basis for affirmance. In defending the Kentucky Supreme Court's judgment, Kentucky's Assistant Attorney General emphasized the State's position on the centrality of the equal protection issue:

"... Mr. Chief Justice, and may it please the Court, the issue before this Court today is simply whether Swain versus Alabama should be reaffirmed....

.      .      .      .      .

"... We believe that it is the Fourteenth Amendment that is the item that should be challenged, and presents perhaps an address to the problem. Swain dealt primarily with the use of peremptory challenges to strike individuals who were of a cognizable or identifiable group.

"Petitioners show no case other than the State of California's case dealing with the use of peremptories wherein the Sixth Amendment was cited as authority for resolving the problem. So, we believe that the Fourteenth Amendment is indeed the issue. That was the guts and primarily the basic concern of Swain.

.      .      .      .      .

"In closing, we believe that the trial court of Kentucky and the Supreme Court of Kentucky have firmly embraced Swain, and we respectfully request that this Court affirm the opinion of the Kentucky court as well as to reaffirm Swain versus Alabama."[1]

In addition to the party's reliance on the equal protection argument in defense of the judgment, several *amici curiae*

---

[1] Tr. of Oral Arg. 27–28, 43.

also addressed that argument. For instance, the argument in the brief filed by the Solicitor General of the United States begins:

"PETITIONER DID NOT ESTABLISH THAT HE WAS DEPRIVED OF A PROPERLY CONSTITUTED PETIT JURY OR DENIED EQUAL PROTECTION OF THE LAWS

"A. Under *Swain* v. *Alabama* A Defendant Cannot Establish An Equal Protection Violation By Showing Only That Black Veniremen Were Subjected To Peremptory Challenge By The Prosecution In His Case"[2]

Several other *amici* similarly emphasized this issue.[3]

In these circumstances, although I suppose it is possible that reargument might enable some of us to have a better informed view of a problem that has been percolating in the courts for several years,[4] I believe the Court acts wisely in

---

[2] Brief for United States as *Amicus Curiae* 7.

[3] The argument section of the brief for the National District Attorneys Association, Inc., as *amicus curiae* in support of respondent begins as follows:

"This Court should conclude that the prosecutorial peremptory challenges exercised in this case were proper under the fourteenth amendment equal protection clause and the sixth amendment. This Court should further determine that there is no constitutional need to change or otherwise modify this Court's decision in *Swain* v. *Alabama.*" *Id.*, at 5.

*Amici* supporting petitioner also emphasized the importance of the equal protection issue. See, *e. g.*, Brief for NAACP Legal Defense and Educational Fund, American Jewish Committee, and American Jewish Congress as *Amici Curiae* 24–36; Brief for Lawyers' Committee for Civil Rights Under Law as *Amicus Curiae* 11–17; Brief for Elizabeth Holtzman as *Amicus Curiae* 13.

[4] See *McCray* v. *New York*, 461 U. S. 961 (1983) (opinion of STEVENS, J., respecting denial of certiorari); *id.*, at 963 (MARSHALL, J., dissenting from denial of certiorari).

The eventual federal habeas corpus disposition of *McCray*, of course, proved to be one of the landmark cases that made the issues in this case

resolving the issue now on the basis of the arguments that have already been fully presented without any special invitation from this Court.[5]

JUSTICE O'CONNOR, concurring.

I concur in the Court's opinion and judgment, but also agree with the views of THE CHIEF JUSTICE and JUSTICE WHITE that today's decision does not apply retroactively.

---

ripe for review. *McCray* v. *Abrams*, 750 F. 2d 1113 (CA2 1984), cert. pending, No. 84–1426. See also Pet. for Cert. 5–7 (relying heavily on *McCray* as a reason for review). In *McCray*, as in almost all opinions that have considered similar challenges, the Court of Appeals for the Second Circuit explicitly addressed the equal protection issue and the viability of *Swain*. 750 F. 2d, at 1118–1124. The pending petition for certiorari in *McCray* similarly raises the equal protection question that has long been central to this issue. Pet. for Cert. in No. 84–1426 (Question 2). Indeed, shortly after agreeing to hear *Batson*, the Court was presented with a motion to consolidate *McCray* and *Batson*, and consider the cases together. Presumably because the Court believed that *Batson* adequately presented the issues with which other courts had consistently grappled in considering this question, the Court denied the motion. See *Abrams* v. *McCray*, 471 U. S. 1097 (1985). Cf. *ibid.* (BRENNAN, MARSHALL, and STEVENS, JJ., dissenting from denial of motion to consolidate).

[5] Although I disagree with his criticism of the Court in this case, I fully subscribe to THE CHIEF JUSTICE's view, expressed today, that the Court should only address issues necessary to the disposition of the case or petition. For contrasting views, see, *e. g.*, *Bender* v. *Williamsport Area School Dist.*, 475 U. S. 534, 551 (1986) (BURGER, C. J., dissenting) (addressing merits even though majority of the Court found a lack of standing); *Colorado* v. *Nunez*, 465 U. S. 324 (1984) (concurring opinion, joined by BURGER, C. J.) (expressing view on merits even though writ was dismissed as improvidently granted because state-court judgment rested on adequate and independent state grounds); *Florida* v. *Casal*, 462 U. S. 637, 639 (1983) (BURGER, C. J., concurring) (agreeing with Court that writ should be dismissed as improvidently granted because judgment rested on adequate and independent state grounds, but noting that "the citizens of the state must be aware that they have the power to amend state law to ensure rational law enforcement"). See also *Colorado* v. *Connelly*, 474 U. S. 1050 (1986) (ordering parties to address issue that neither party raised); *New Jersey* v. *T. L. O.*, 468 U. S. 1214 (1984) (same).

CHIEF JUSTICE BURGER, joined by JUSTICE REHNQUIST, dissenting.

We granted certiorari to decide whether petitioner was tried "in violation of constitutional provisions guaranteeing the defendant an impartial jury and a jury composed of persons representing a fair cross section of the community." Pet. for Cert. i.

I

Today the Court sets aside the peremptory challenge, a procedure which has been part of the common law for many centuries and part of our jury system for nearly 200 years. It does so on the basis of a constitutional argument that was rejected, without a single dissent, in *Swain* v. *Alabama*, 380 U. S. 202 (1965). Reversal of such settled principles would be unusual enough on its own terms, for only three years ago we said that "*stare decisis*, while perhaps never entirely persuasive on a constitutional question, is a doctrine that demands respect in a society governed by the rule of law." *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 420 (1983). What makes today's holding truly extraordinary is that it is based on a constitutional argument that the petitioner has *expressly* declined to raise, both in this Court and in the Supreme Court of Kentucky.

In the Kentucky Supreme Court, petitioner disclaimed specifically any reliance on the Equal Protection Clause of the Fourteenth Amendment, pressing instead only a claim based on the Sixth Amendment. See Brief for Appellant 14 and Reply Brief for Appellant 1 in No. 84–SC–733–MR (Ky.). As petitioner explained at oral argument here: "We have not made an equal protection claim. . . . We have not made a specific argument in the briefs that have been filed either in the Supreme Court of Kentucky or in this Court saying that we are attacking Swain as such." Tr. of Oral Arg. 6–7. Petitioner has not suggested any barrier prevented raising an equal protection claim in the Kentucky courts. In such circumstances, review of an equal protection argument is im-

proper in this Court: "'The Court has consistently refused to decide federal constitutional issues raised here for the first time on review of state court decisions . . . .'" *Illinois* v. *Gates*, 459 U. S. 1028, 1029, n. 2 (1982) (STEVENS, J., dissenting) (quoting *Cardinale* v. *Louisiana*, 394 U. S. 437, 438 (1969)). Neither the Court nor JUSTICE STEVENS offers any justification for departing from this time-honored principle, which dates to *Owings* v. *Norwood's Lessee*, 5 Cranch 344 (1809), and *Crowell* v. *Randell*, 10 Pet. 368 (1836).

Even if the equal protection issue had been pressed in the Kentucky Supreme Court, it has surely not been pressed here. This provides an additional and completely separate procedural novelty to today's decision. Petitioner's "question presented" involved only the "constitutional provisions guaranteeing the defendant an impartial jury and a jury composed of persons representing a fair cross section of the community." Pet. for Cert. i. These provisions are found in the Sixth Amendment, not the Equal Protection Clause of the Fourteenth Amendment relied upon by the Court. In his brief on the merits, under a heading distinguishing equal protection cases, petitioner noted "the irrelevance of the *Swain* analysis to the present case," Brief for Petitioner 11; instead petitioner relied solely on Sixth Amendment analysis found in cases such as *Taylor* v. *Louisiana*, 419 U. S. 522 (1975). During oral argument, counsel for petitioner was pointedly asked:

"QUESTION: Mr. Niehaus, Swain was an equal protection challenge, was it not?

"MR. NIEHAUS: Yes.

"QUESTION: Your claim here is based solely on the Sixth Amendment?

"MR. NIEHAUS: Yes.

"QUESTION: Is that correct?

"MR. NIEHAUS: That is what we are arguing, yes.

"QUESTION: You are not asking for a reconsideration of Swain, and you are making no equal protection claim here. Is that correct?

"MR. NIEHAUS: We have not made an equal protection claim. I think that Swain will have to be reconsidered to a certain extent if only to consider the arguments that are made on behalf of affirmance by the respondent and the solicitor general.

. . . . .

"MR. NIEHAUS: We have not made a specific argument in the briefs that have been filed either in the Supreme Court of Kentucky or in this Court saying that we are attacking Swain as such. . . ." Tr. of Oral Arg. 5–7.

A short time later, after discussing the difficulties attendant with a Sixth Amendment claim, the following colloquy occurred:

"QUESTION: So I come back again to my question why you didn't attack Swain head on, but I take it if the Court were to overrule Swain, you wouldn't like that result.

"MR. NIEHAUS: Simply overrule Swain without adopting the remedy?

"QUESTION: Yes.

"MR. NIEHAUS: I do not think that would give us much comfort, Your Honor, no.

"QUESTION: That is a concession." Id., at 10.

Later, petitioner's counsel refused to answer the Court's questions concerning the implications of a holding based on equal protection concerns:

"MR. NIEHAUS: . . . [T]here is no state action involved where the defendant is exercising his peremptory challenge.

"QUESTION: But there might be under an equal protection challenge if it is the state system that allows that kind of a strike.

"MR. NIEHAUS: I believe that is possible. I am really not prepared to answer that specific question. . . ." *Id.*, at 20.

In reaching the equal protection issue despite petitioner's clear refusal to present it, the Court departs dramatically from its normal procedure without any explanation. When we granted certiorari, we could have—as we sometimes do—directed the parties to brief the equal protection question in addition to the Sixth Amendment question. See, *e. g., Paris Adult Theatre I* v. *Slaton*, 408 U. S. 921 (1972); *Colorado* v. *Connelly*, 474 U. S. 1050 (1986).[1] Even following oral argument, we could have—as we sometimes do—directed reargument on this particular question. See, *e. g., Brown* v. *Board of Education*, 345 U. S. 972 (1953); *Illinois* v. *Gates, supra; New Jersey* v. *T. L. O.*, 468 U. S. 1214 (1984).[2] This step is particularly appropriate where re-

---

[1] In *Colorado* v. *Connelly*, JUSTICE BRENNAN, joined by JUSTICE STEVENS, filed a memorandum objecting to this briefing of an additional question, explaining that "it is hardly for this Court to 'second chair' the prosecutor to alter his strategy or guard him from mistakes. Under this Court's Rule 21.1(a), '[o]nly the questions set forth in the petition or fairly included therein will be considered by the Court.' Given petitioner's express disclaimer that [this] issue is presented, that question obviously is not 'fairly included' in the question submitted. The Court's direction that the parties address it anyway makes meaningless in this case the provisions of this Rule and is plainly cause for concern, particularly since it is clear that a similar dispensation would not be granted a criminal defendant, however strong his claim." 474 U. S., at 1052. If the Court's limited step of directing briefing on an additional point at the time certiorari was granted was "cause for concern," I would think *a fortiori* that the far more expansive action the Court takes today would warrant similar concern.

[2] JUSTICE STEVENS, joined by JUSTICE BRENNAN and JUSTICE MARSHALL, dissented from the order directing reargument in *New Jersey* v. *T. L. O.* They explained:

"The single question presented to the Court has now been briefed and argued. Evidently unable or unwilling to decide the question presented

examination of a prior decision is under consideration. See, *e. g., Garcia* v. *San Antonio Metropolitan Transit Authority,* 468 U. S. 1213 (1984) (directing reargument and briefing on issue of whether *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), should be reconsidered); *Alfred Dunhill of London, Inc.* v. *Republic of Cuba,* 422 U. S. 1005 (1975) (directing reargument and briefing on issue of whether the holding in *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398 (1964), should be reconsidered). Alternatively, we could have simply dismissed this petition as improvidently granted.

The Court today rejects these accepted courses of action, choosing instead to reverse a 21-year-old unanimous constitutional holding of this Court on the basis of constitutional arguments expressly disclaimed by petitioner. The only explanation for this action is found in JUSTICE STEVENS' concurrence. JUSTICE STEVENS apparently believes that this issue is properly before the Court because "the party defending the judgment has explicitly rested on the issue in question as a controlling basis for affirmance." *Ante,* at 109. Cf. *Illinois* v. *Gates,* 459 U. S., at 1029, n. 1 (STEVENS, J., dissenting) ("[T]here is no impediment to presenting a new argument as an alternative basis for *affirming* the decision below") (emphasis in original). To be sure, respondent and supporting *amici* did cite *Swain* and the Equal Protection Clause. But their arguments were largely limited to ex-

---

by the parties, the Court, instead of dismissing the writ of certiorari as improvidently granted, orders reargument directed to the questions that [petitioner] decided not to bring here. . . . Volunteering unwanted advice is rarely a wise course of action.

.            .            .            .            .

"I believe that the adversary process functions most effectively when we rely on the initiative of lawyers, rather than the activism of judges, to fashion the questions for review." 468 U. S., at 1215–1216.

JUSTICE STEVENS' proffered explanation notwithstanding, see *ante,* at 109 (concurring opinion), I am at a loss to discern how one can consistently hold these views and still reach the question the Court reaches today.

plaining that *Swain* placed a negative gloss on the Sixth Amendment claim actually raised by petitioner. In any event, it is a strange jurisprudence that looks to the arguments made by respondent to determine the breadth of the questions presented for our review by petitioner. Of course, such a view is directly at odds with our Rule 21.1(a), which provides that "[o]nly the questions set forth in the petition or fairly included therein will be considered by the Court." JUSTICE STEVENS does not cite, and I am not aware of, *any* case in this Court's nearly 200-year history where the alternative grounds urged by respondent to affirm a judgment were then seized upon to permit petitioner to obtain relief from that very judgment despite petitioner's failure to urge that ground.

JUSTICE STEVENS also observes that several *amici curiae* address the equal protection argument. *Ante*, at 109–110, and n. 3. But I thought it well settled that, even if a "point is made in an *amicus curiae* brief," if the claim "has never been advanced by petitioners . . . we have no reason to pass upon it." *Knetsch* v. *United States*, 364 U. S. 361, 370 (1960).

When objections to peremptory challenges were brought to this Court three years ago, JUSTICE STEVENS agreed with JUSTICE MARSHALL that the challenge involved "a significant and recurring question of constitutional law." *McCray* v. *New York*, 461 U. S. 961, 963 (1983) (MARSHALL, J., dissenting from denial of certiorari), referred to with approval, *id.*, at 961 (opinion of STEVENS, J., respecting denial of certiorari). Nonetheless, JUSTICE STEVENS wrote that the issue could be dealt with "more wisely at a later date." *Id.*, at 962. The same conditions exist here today. JUSTICE STEVENS concedes that reargument of this case "might enable some of us to have a better informed view of a problem that has been percolating in the courts for several years." *Ante*, at 110. Thus, at bottom his position is that we should overrule an extremely important prior constitutional decision of this Court on a claim not advanced here, even though briefing and oral

argument on this claim might convince us to do otherwise.[3] I believe that "[d]ecisions made in this manner are unlikely to withstand the test of time." *United States* v. *Leon*, 468 U. S. 897, 962 (1984) (STEVENS, J., dissenting). Before contemplating such a holding, I would at least direct reargument and briefing on the issue of whether the equal protection holding in *Swain* should be reconsidered.

## II

Because the Court nonetheless chooses to decide this case on the equal protection grounds not presented, it may be useful to discuss this issue as well. The Court acknowledges, albeit in a footnote, the "'very old credentials'" of the peremptory challenge and the "'widely held belief that peremptory challenge is a necessary part of trial by jury.'" *Ante*, at 91, n. 15 (quoting *Swain*, 380 U. S., at 219). But proper resolution of this case requires more than a nodding reference to the purpose of the challenge. Long ago it was

---

[3] This fact alone distinguishes the cases cited by JUSTICE STEVENS as support for today's unprecedented action. See *ante*, at 111, n. 5. In *Bender* v. *Williamsport Area School Dist.*, 475 U. S. 534, 551 (1986) (BURGER, C. J., dissenting), *Colorado* v. *Nunez*, 465 U. S. 324 (1984) (WHITE, J., concurring), and *Florida* v. *Casal*, 462 U. S. 637, 639 (1983) (BURGER, C. J., concurring), the issues discussed were all the primary issues advanced, briefed, and argued by the petitioners in this Court or related directly to the Court's basis for deciding the case. To be sure, some of the discussion in these separate statements might be parsimoniously viewed as "[un]necessary to the disposition of the case or petition." *Ante*, at 111, n. 5. But under this approach, many dissenting opinions and dissents from the denial of certiorari would have to be condemned as well. More important, in none of these separate statements was it even suggested that it would be proper to overturn a state-court judgment on issues that had not been briefed and argued by petitioner in this Court, as the Court does today. Finally, in *Colorado* v. *Connelly*, 474 U. S. 1050 (1986), and *New Jersey* v. *T. L. O.*, 468 U. S. 1214 (1984), we directed briefing and argument on particular questions before deciding them. Such a procedure serves the desirable end of ensuring that the issues which the Court wishes to consider will be fully briefed and argued. My suggestion that the Court hear reargument of this case serves the same end.

recognized that "[t]he right of challenge is almost essential for the purpose of securing perfect fairness and impartiality in a trial." W. Forsyth, History of Trial by Jury 175 (1852). The peremptory challenge has been in use without scrutiny into its basis for nearly as long as juries have existed. "It was in use amongst the Romans in criminal cases, and the *Lex Servilia* (B.C. 104) enacted that the accuser and the accused should severally propose one hundred *judices*, and that each might reject fifty from the list of the other, so that one hundred would remain to try the alleged crime." *Ibid.;* see also J. Pettingal, An Enquiry into the Use and Practice of Juries Among the Greeks and Romans 115, 135 (1769).

In *Swain* JUSTICE WHITE traced the development of the peremptory challenge from the early days of the jury trial in England:

> "In all trials for felonies at common law, the defendant was allowed to challenge peremptorily 35 jurors, and the prosecutor originally had a right to challenge any number of jurors without cause, a right which was said to tend to 'infinite delayes and danger.' Coke on Littleton 156 (14th ed. 1791). Thus The Ordinance for Inquests, 33 Edw. 1, Stat. 4 (1305), provided that if 'they that sue for the King will challenge any . . . Jurors, they shall assign . . . a Cause certain.' So persistent was the view that a proper jury trial required peremptories on both sides, however, that the statute was construed to allow the prosecution to direct any juror after examination to 'stand aside' until the entire panel was gone over and the defendant had exercised his challenges; only if there was a deficiency of jurors in the box at that point did the Crown have to show cause in respect to jurors recalled to make up the required number. Peremptories on both sides became the settled law of England, continuing in the above form until after the separation of the Colonies." 380 U. S., at 212–213 (footnotes omitted).

Peremptory challenges have a venerable tradition in this country as well:

> "In the federal system, Congress early took a part of the subject in hand in establishing that the defendant was entitled to 35 peremptories in trials for treason and 20 in trials for other felonies specified in the 1790 Act as punishable by death, 1 Stat. 119 (1790). In regard to trials for other offenses without the 1790 statute, both the defendant and the Government were thought to have a right of peremptory challenge, although the source of this right was not wholly clear. . . .
>
> "The course in the States apparently paralleled that in the federal system. The defendant's right of challenge was early conferred by statute, the number often corresponding to the English practice, the prosecution was thought to have retained the Crown's common-law right to stand aside, and by 1870, most if not all, States had enacted statutes conferring on the prosecution a substantial number of peremptory challenges, the number generally being at least half, but often equal to, the number had by the defendant." *Id.*, at 214–216 (footnotes omitted).

The Court's opinion, in addition to ignoring the teachings of history, also contrasts with *Swain* in its failure to even discuss the rationale of the peremptory challenge. *Swain* observed:

> "The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed for them, and not otherwise. In this way the peremptory satisfies the rule that 'to perform its high function in the best way, "justice must satisfy the appearance of justice."'" *Id.*, at 219 (quoting *In re Murchison*, 349 U. S. 133, 136 (1955)).

Permitting unexplained peremptories has long been regarded as a means to strengthen our jury system in other ways as well. One commentator has recognized:

> "The peremptory, made without giving any reason, avoids trafficking in the core of truth in most common stereotypes. . . . Common human experience, common sense, psychosociological studies, and public opinion polls tell us that it is likely that certain classes of people statistically have predispositions that would make them inappropriate jurors for particular kinds of cases. But to allow this knowledge to be expressed in the evaluative terms necessary for challenges for cause would undercut our desire for a society in which all people are judged as individuals and in which each is held reasonable and open to compromise. . . . [For example,] [a]lthough experience reveals that black males as a class can be biased against young alienated blacks who have not tried to join the middle class, to enunciate this in the concrete expression required of a challenge for cause is societally divisive. Instead we have evolved in the peremptory challenge a system that allows the covert expression of what we dare not say but know is true more often than not." Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan. L. Rev. 545, 553–554 (1975).

For reasons such as these, this Court concluded in *Swain* that "the [peremptory] challenge is 'one of the most important of the rights'" in our justice system. *Swain*, 380 U. S., at 219 (quoting *Pointer* v. *United States*, 151 U. S. 396, 408 (1894)). For close to a century, then, it has been settled that "[t]he denial or impairment of the right is reversible error without a showing of prejudice." *Swain, supra*, at 219 (citing *Lewis* v. *United States*, 146 U. S. 370 (1892)).

Instead of even considering the history or function of the peremptory challenge, the bulk of the Court's opinion is spent recounting the well-established principle that intentional exclusion of racial groups from jury venires is a

violation of the Equal Protection Clause. I too reaffirm that principle, which has been a part of our constitutional tradition since at least *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). But if today's decision is nothing more than mere "application" of the "principles announced in *Strauder*," as the Court maintains, *ante*, at 89–90, some will consider it curious that the application went unrecognized for over a century. The Court in *Swain* had no difficulty in unanimously concluding that cases such as *Strauder* did not require inquiry into the basis for a peremptory challenge. See *post*, at 135–137 (REHNQUIST, J., dissenting). More recently we held that "[d]efendants are not entitled to a jury of any particular composition . . . ." *Taylor* v. *Louisiana*, 419 U. S., at 538.

A moment's reflection quickly reveals the vast differences between the racial exclusions involved in *Strauder* and the allegations before us today:

> "Exclusion from the venire summons process implies that the government (usually the legislative or judicial branch) . . . has made the general determination that those excluded are unfit to try *any* case. Exercise of the peremptory challenge, by contrast, represents the discrete decision, made by one of two or more opposed *litigants* in the trial phase of our adversary system of justice, that the challenged venireperson will likely be more unfavorable to that litigant in that *particular case* than others on the same venire.
>
> "Thus, excluding a particular cognizable group from all ·venire pools is stigmatizing and discriminatory in several interrelated ways that the peremptory challenge is not. The former singles out the excluded group, while individuals of all groups are equally subject to peremptory challenge on any basis, including their group affiliation. Further, venire-pool exclusion bespeaks *a priori* across-the-board total unfitness, while peremptory-strike exclusion merely suggests potential partiality in a particular

isolated case. Exclusion from venires focuses on the inherent attributes of the excluded group and infers its *inferiority*, but the peremptory does not. To suggest that a particular race is unfit to judge in any case necessarily is racially insulting. To suggest that each race may have its own special concerns, or even may tend to favor its own, is not." *United States* v. *Leslie*, 783 F. 2d 541, 554 (CA5 1986) (en banc).

Unwilling to rest solely on jury venire cases such as *Strauder*, the Court also invokes general equal protection principles in support of its holding. But peremptory challenges are often lodged, of necessity, for reasons "normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty." *Swain, supra,* at 220. Moreover, in making peremptory challenges, both the prosecutor and defense attorney necessarily act on only limited information or hunch. The process cannot be indicted on the sole basis that such decisions are made on the basis of "assumption" or "intuitive judgment." *Ante,* at 97. As a result, unadulterated equal protection analysis is simply inapplicable to peremptory challenges exercised in any particular case. A clause that requires a minimum "rationality" in government actions has no application to "'an arbitrary and capricious right,'" *Swain, supra,* at 219 (quoting *Lewis* v. *United States, supra,* at 378); a constitutional principle that may invalidate state action on the basis of "stereotypic notions," *Mississippi University for Women* v. *Hogan,* 458 U. S. 718, 725 (1982), does not explain the breadth of a procedure exercised on the "'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another.'" *Lewis, supra,* at 376 (quoting 4 W. Blackstone, Commentaries *353).

That the Court is not applying conventional equal protection analysis is shown by its limitation of its new rule to allegations of impermissible challenge *on the basis of race;* the

Court's opinion clearly contains such a limitation. See *ante*, at 96 (to establish a prima facie case, "the defendant first must show that he is a member of a cognizable *racial group*") (emphasis added); *ibid*. ("[F]inally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury *on account of their race*") (emphasis added). But if conventional equal protection principles apply, then presumably defendants could object to exclusions on the basis of not only race, but also sex, *Craig v. Boren*, 429 U. S. 190 (1976); age, *Massachusetts Bd. of Retirement v. Murgia*, 427 U. S. 307 (1976); religious or political affiliation, *Karcher v. Daggett*, 462 U. S. 725, 748 (1983) (STEVENS, J., concurring); mental capacity, *Cleburne v. Cleburne Living Center, Inc.*, 473 U. S. 432 (1985); number of children, *Dandridge v. Williams*, 397 U. S. 471 (1970); living arrangements, *Department of Agriculture v. Moreno*, 413 U. S. 528 (1973); and employment in a particular industry, *Minnesota v. Clover Leaf Creamery Co.*, 449 U. S. 456 (1981), or profession, *Williamson v. Lee Optical Co.*, 348 U. S. 483 (1955).[4]

In short, it is quite probable that every peremptory challenge could be objected to on the basis that, because it excluded a venireman who had some characteristic not shared by the remaining members of the venire, it constituted a "classification" subject to equal protection scrutiny. See *McCray v. Abrams*, 750 F. 2d 1113, 1139 (CA2 1984) (Meskill, J., dissenting), cert. pending, No. 84–1426. Compounding the difficulties, under conventional equal protection principles some uses of peremptories would be reviewed under "strict scrutiny and . . . sustained only if . . . suitably tailored to serve a compelling state interest," *Cleburne*, 473

---

[4] While all these distinctions might support a claim under conventional equal protection principles, a defendant would also have to establish standing to raise them before obtaining any relief. See *Alexander v. Louisiana*, 405 U. S. 625, 633 (1972).

U. S., at 440; others would be reviewed to determine if they were "substantially related to a sufficiently important government interest," *id.*, at 441; and still others would be reviewed to determine whether they were "a rational means to serve a legitimate end." *Id.* at 442.

The Court never applies this conventional equal protection framework to the claims at hand, perhaps to avoid acknowledging that the state interest involved here has historically been regarded by this Court as substantial, if not compelling. Peremptory challenges have long been viewed as a means to achieve an impartial jury that will be sympathetic toward neither an accused nor witnesses for the State on the basis of some shared factor of race, religion, occupation, or other characteristic. Nearly a century ago the Court stated that the peremptory challenge is "essential to the fairness of trial by jury." *Lewis* v. *United States*, 146 U. S., at 376. Under conventional equal protection principles, a state interest of this magnitude and ancient lineage might well overcome an equal protection objection to the application of peremptory challenges. However, the Court is silent on the strength of the State's interest, apparently leaving this issue, among many others, to the further "litigation [that] will be required to spell out the contours of the Court's equal protection holding today . . . ." *Ante*, at 102 (WHITE, J., concurring).[5]

The Court also purports to express "no views on whether the Constitution imposes any limit on the exercise of peremptory challenges by *defense* counsel." *Ante*, at 89, n. 12 (emphasis added). But the clear and inescapable import of this novel holding will inevitably be to limit the use of this valu-

---

[5] The Court is also silent on whether a State may demonstrate that its use of peremptories rests not merely on "assumptions," *ante*, at 97, but on sociological studies or other similar foundations. See Saltzburg & Powers, Peremptory Challenges and the Clash Between Impartiality and Group Representation, 41 Md. L. Rev. 337, 365, and n. 124 (1982). For "[i]f the assessment of a juror's prejudices based on group affiliation is accurate, . . . then counsel has exercised the challenge as it was intended—to remove the most partial jurors." *Id.*, at 365.

able tool to both prosecutors and defense attorneys alike. Once the Court has held that *prosecutors* are limited in their use of peremptory challenges, could we rationally hold that defendants are not?[6]  "Our criminal justice system 'requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution.  Between him and the state the scales are to be evenly held.'"  *Ante*, at 107 (MARSHALL, J., concurring) (quoting *Hayes* v. *Missouri*, 120 U. S. 68, 70 (1887)).

Rather than applying straightforward equal protection analysis, the Court substitutes for the holding in *Swain* a curious hybrid.  The defendant must first establish a "prima facie case," *ante*, at 93–94, of invidious discrimination, then the "burden shifts to the State to come forward with a neutral explanation for challenging black jurors."  *Ante*, at 97. The Court explains that "the operation of prima facie burden of proof rules" is established in "[o]ur decisions concerning 'disparate treatment' . . . ."  *Ante*, at 94, n. 18.  The Court then adds, borrowing again from a Title VII case, that "the prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges."  *Ante*, at 98, n. 20 (quoting *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 258 (1981)).[7]

While undoubtedly these rules are well suited to other contexts, particularly where (as with Title VII) they are required by an Act of Congress,[8] they seem curiously out

---

[6] "[E]very jurisdiction which has spoken to the matter, and prohibited prosecution case-specific peremptory challenges on the basis of cognizable group affiliation, has held that the defense must likewise be so prohibited." *United States* v. *Leslie*, 783 F. 2d 541, 565 (CA5 1986) (en banc).

[7] One court has warned that overturning *Swain* has "[t]he potential for stretching out criminal trials that are already too long, by making the voir dire a Title VII proceeding in miniature." *United States* v. *Clark*, 737 F. 2d 679, 682 (CA7 1984).  That "potential" is clearly about to be realized.

[8] It is worth observing that Congress has been unable to locate the constitutional deficiencies in the peremptory challenge system that the Court discerns today.  As the Solicitor General explains in urging a re-

of place when applied to peremptory challenges in criminal cases. Our system permits two types of challenges: challenges for cause and peremptory challenges. Challenges for cause obviously have to be explained; by definition, peremptory challenges do not. "It is called a peremptory challenge, because the prisoner may challenge peremptorily, on his own dislike, *without showing of any cause.*" H. Joy, On Peremptory Challenge of Jurors 1 (1844) (emphasis added). Analytically, there is no middle ground: A challenge either has to be explained or it does not. It is readily apparent, then, that to permit inquiry into the basis for a peremptory challenge would force "the peremptory challenge [to] collapse into the challenge for cause." *United States* v. *Clark*, 737 F. 2d 679, 682 (CA7 1984). Indeed, the Court recognized without dissent in *Swain* that, if scrutiny were permitted, "[t]he challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards." *Swain*, 380 U. S., at 222.

Confronted with the dilemma it created, the Court today attempts to decree a middle ground. To rebut a prima facie case, the Court requires a "neutral explanation" for the challenge, but is at pains to "emphasize" that the "explanation need not rise to the level justifying exercise of a challenge for cause." *Ante*, at 97. I am at a loss to discern the governing principles here. A "clear and reasonably specific" explanation of "legitimate reasons" for exercising the challenge will be difficult to distinguish from a challenge for cause. Any-

jection of the Sixth Amendment issue presented by this petition and an affirmance of the decision below, "[i]n reconciling the traditional peremptory challenge system with the requirements of the Sixth Amendment it is instructive to consider the accommodation made by Congress in the Jury Selection and Service Act of 1968, 28 U. S. C. 1861 *et seq.* . . . . [T]he House Report makes clear that . . . 'the bill leaves undisturbed the right of a litigant to exercise his peremptory challenges to eliminate jurors for purely subjective reasons.'" Brief for United States as *Amicus Curiae* 20, n. 11 (quoting H. R. Rep. No. 1076, 90th Cong., 2d Sess., 5–6 (1968)).

thing short of a challenge for cause may well be seen as an "arbitrary and capricious" challenge, to use Blackstone's characterization of the peremptory. See 4 W. Blackstone, Commentaries *353. Apparently the Court envisions permissible challenges short of a challenge for cause that are just a little bit arbitrary—but not too much. While our trial judges are "experienced in supervising *voir dire*," *ante*, at 97, they have no experience in administering rules like this.

An example will quickly demonstrate how today's holding, while purporting to "further the ends of justice," *ante*, at 99, will not have that effect. Assume an Asian defendant, on trial for the capital murder of a white victim, asks prospective jury members, most of whom are white, whether they harbor racial prejudice against Asians. See *Turner* v. *Murray*, *ante*, at 36–37. The basis for such a question is to flush out any "juror who believes that [Asians] are violence-prone or morally inferior . . . ." *Ante*, at 35.[9] Assume further that all white jurors deny harboring racial prejudice but that the defendant, on trial for his life, remains unconvinced by these protestations. Instead, he continues to harbor a hunch, an "assumption," or "intuitive judgment," *ante*, at 97, that these white jurors will be prejudiced against him, presumably based in part on race. The time-honored rule before today was that peremptory challenges could be exercised on such a basis. The Court explained in *Lewis* v. *United States:*

> "[H]ow necessary it is that a prisoner (when put to defend his life) should have good opinion of his jury, the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom

---

[9] This question, required by *Turner* in certain capital cases, demonstrates the inapplicability of traditional equal protection analysis to a jury *voir dire* seeking an impartial jury. Surely the question rests on generalized, stereotypic racial notions that would be condemned on equal protection grounds in other contexts.

he has conceived a prejudice even without being able to assign a reason for such his dislike." 146 U. S., at 376.

The effect of the Court's decision, however, will be to force the defendant to come forward and "articulate a neutral explanation," *ante*, at 98, for his peremptory challenge, a burden he probably cannot meet. This example demonstrates that today's holding will produce juries that the parties do not believe are truly impartial. This will surely do more than "disconcert" litigants; it will diminish confidence in the jury system.

A further painful paradox of the Court's holding is that it is likely to interject racial matters back into the jury selection process, contrary to the general thrust of a long line of Court decisions and the notion of our country as a "melting pot." In *Avery* v. *Georgia,* 345 U. S. 559 (1953), for instance, the Court confronted a situation where the selection of the venire was done through the selection of tickets from a box; the names of whites were printed on tickets of one color and the names of blacks were printed on different color tickets. The Court had no difficulty in striking down such a scheme. Justice Frankfurter observed that "opportunity for working of a discriminatory system exists whenever the mechanism for jury selection *has a component part,* such as the slips here, *that differentiates between white and colored . . . .*" *Id.,* at 564 (concurring) (emphasis added).

Today we mark the return of racial differentiation as the Court accepts a positive evil for a perceived one. Prosecutors and defense attorneys alike will build records in support of their claims that peremptory challenges have been exercised in a racially discriminatory fashion by asking jurors to state their racial background and national origin for the record, despite the fact that "such questions may be offensive to some jurors and thus are not ordinarily asked on voir dire." *People* v. *Motton,* 39 Cal. 3d 596, 604, 704 P. 2d

176, 180, modified, 40 Cal. 3d 4b (1985) (advance sheet).[10] This process is sure to tax even the most capable counsel and judges since determining whether a prima facie case has been established will "require a continued monitoring and recording of the 'group' composition of the panel present and prospective . . . ." *People* v. *Wheeler,* 22 Cal. 3d 258, 294, 583 P. 2d 748, 773 (1978) (Richardson, J., dissenting).

Even after a "record" on this issue has been created, disputes will inevitably arise. In one case, for instance, a conviction was reversed based on the assumption that no blacks were on the jury that convicted a defendant. See *People* v. *Motton, supra.* However, after the court's decision was announced, Carolyn Pritchett, who had served on the jury, called the press to state that the court was in error and that she was black. 71 A. B. A. J. 22 (Nov. 1985). The California court nonetheless denied a rehearing petition.[11]

The Court does not tarry long over any of these difficult, sensitive problems, preferring instead to gloss over them as swiftly as it slides over centuries of history: "[W]e make no attempt to instruct [trial] courts how best to implement

[10] The California Supreme Court has attempted to finesse this problem by asserting that "discrimination is more often based on appearances than verified racial descent, and a showing that the prosecution was systematically excusing persons who appear to be Black would establish a prima facie case" of racial discrimination. *People* v. *Motton,* 39 Cal. 3d, at 604, 704 P. 2d, at 180. This suggests, however, that proper inquiry here concerns not the actual race of the jurors who are excluded, but rather counsel's subjective impressions as to what race they spring from. It is unclear just how a "record" of such impressions is to be made.

[11] Similar difficulties may lurk in this case on remand. The Court states as fact that "a jury composed only of white persons was selected." *Ante,* at 83. The only basis for the Court's finding is the prosecutor's statement, in response to a question from defense counsel, that "[i]n looking at them, yes; it's an all-white jury." App. 3.

It should also be underscored that the Court today does *not* hold that petitioner has established a "prima facie case" entitling him to any form of relief. *Ante,* at 100.

our holding today." *Ante*, at 99–100, n. 24. That leaves roughly 7,000 general jurisdiction state trial judges and approximately 500 federal trial judges at large to find their way through the morass the Court creates today. The Court essentially wishes these judges well as they begin the difficult enterprise of sorting out the implications of the Court's newly created "right." I join my colleagues in wishing the Nation's judges well as they struggle to grasp how to implement today's holding. To my mind, however, attention to these "implementation" questions leads quickly to the conclusion that there is no "good" way to implement the holding, let alone a "best" way. As one apparently frustrated judge explained after reviewing a case under a rule like that promulgated by the Court today, judicial inquiry into peremptory challenges

> "from case to case will take the courts into the quagmire of quotas for groups that are difficult to define and even more difficult to quantify in the courtroom. The pursuit of judicial perfection will require both trial and appellate courts to provide speculative and impractical answers to artificial questions." *Holley* v. *J & S Sweeping Co.*, 143 Cal. App. 3d 588, 595–596, 192 Cal. Rptr. 74, 79 (1983) (Holmdahl, J., concurring) (footnote omitted).

The Court's effort to "furthe[r] the ends of justice," *ante*, at 99, and achieve hoped-for utopian bliss may be admired, but it is far more likely to enlarge the evil "sporting contest" theory of criminal justice roundly condemned by Roscoe Pound almost 80 years ago to the day. See Pound, Causes of Popular Dissatisfaction with the Administration of Justice, August 29, 1906, reprinted in The Pound Conference: Perspectives on Justice in the Future 337 (A. Levin & R. Wheeler eds. 1979). Pound warned then that "too much of the current dissatisfaction has a just origin in our judicial organization and procedure." *Id.*, at 352. I am afraid that today's newly created constitutional right will justly give rise to similar disapproval.

## III

I also add my assent to JUSTICE WHITE's conclusion that today's decision does not apply retroactively. *Ante,* at 102 (concurring); see also *ante,* at 111 (O'CONNOR, J., concurring). We held in *Solem* v. *Stumes,* 465 U. S. 638, 643 (1984), that

> "'[t]he criteria guiding resolution of the [retroactivity] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.' *Stovall* v. *Denno,* 388 U. S. 293, 297 (1967)."

If we are to ignore Justice Harlan's admonition that making constitutional changes prospective only "cuts this Court loose from the force of precedent," *Mackey* v. *United States,* 401 U. S. 667, 680 (1971) (concurring in judgment), then all three of these factors point conclusively to a nonretroactive holding. With respect to the first factor, the new rule the Court announces today is not designed to avert "the clear danger of convicting the innocent." *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406, 416 (1966). Second, it is readily apparent that "law enforcement authorities and state courts have justifiably relied on a prior rule of law . . . ." *Solem,* 465 U. S., at 645–646. Today's holding clearly "overrule[s] [a] prior decision" and drastically "transform[s] standard practice." *Id.,* at 647. This fact alone "virtually compel[s]" the conclusion of nonretroactivity. *United States* v. *Johnson,* 457 U. S. 537, 549–550 (1982). Third, applying today's decision retroactively obviously would lead to a whole host of problems, if not utter chaos. Determining whether a defendant has made a "prima facie showing" of invidious intent, *ante,* at 97, and, if so, whether the state has a sufficient "neutral explanation" for its actions, *ibid.,* essentially requires re-

constructing the entire *voir dire*, something that will be extremely difficult even if undertaken soon after the close of the trial.[12]   In most cases, therefore, retroactive application of today's decision will be "a virtual impossibility."   *State* v. *Neil*, 457 So. 2d 481, 488 (Fla. 1984).

In sum, under our prior holdings it is impossible to construct even a colorable argument for retroactive application. The few States that have adopted judicially created rules similar to that announced by the Court today have all refused full retroactive application.   See *People* v. *Wheeler*, 22 Cal. 3d, at 283, n. 31, 583 P. 2d, at 766, n. 31; *State* v. *Neil*, *supra*, at 488; *Commonwealth* v. *Soares*, 377 Mass. 461, 493, n. 38, 387 N. E. 2d 499, 518, n. 38, cert. denied, 444 U. S. 881 (1979).[13]   I therefore am persuaded by JUSTICE WHITE's position, *ante*, at 102 (concurring), that today's novel decision is not to be given retroactive effect.

## IV

An institution like the peremptory challenge that is part of the fabric of our jury system should not be casually cast aside, especially on a basis not raised or argued by the petitioner.   As one commentator aptly observed:

"The real question is whether to tinker with a system, be it of jury selection or anything else, that has done the job for centuries.   We stand on the shoulders of our ancestors, as Burke said.   It is not so much that the past is always worth preserving, he argued, but rather that 'it is with infinite caution that any man ought to venture upon pulling down an edifice, which has answered in any tolerable degree for ages the common purposes

[12] Petitioner concedes that it would be virtually impossible for the prosecutor in this case to recall why he used his peremptory challenges in the fashion he did.   Brief for Petitioner 35.

[13] Although Delaware has suggested that it might follow a rule like that adopted by the Court today, see *Riley* v. *State*, 496 A. 2d 997 (1985), the issue of retroactive application of the rule does not appear to have been litigated in a published decision.

of society. . . .'"  Younger, Unlawful Peremptory Challenges, 7 Litigation 23, 56 (Fall 1980).

At the very least, this important case reversing centuries of history and experience ought to be set for reargument next Term.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court states, in the opening line of its opinion, that this case involves only a reexamination of that portion of *Swain* v. *Alabama*, 380 U. S. 202 (1965), concerning "the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury." *Ante*, at 82 (footnote omitted). But in reality the majority opinion deals with much more than "evidentiary burden[s]." With little discussion and less analysis, the Court also overrules one of the fundamental substantive holdings of *Swain*, namely, that the State may use its peremptory challenges to remove from the jury, on a case-specific basis, prospective jurors of the same race as the defendant. Because I find the Court's rejection of this holding both ill considered and unjustifiable under established principles of equal protection, I dissent.

In *Swain*, this Court carefully distinguished two possible scenarios involving the State's use of its peremptory challenges to exclude blacks from juries in criminal cases. In Part III of the majority opinion, the *Swain* Court concluded that the first of these scenarios, namely, the exclusion of blacks "for reasons wholly unrelated to the outcome of the particular case on trial . . . to deny the Negro the same right and opportunity to participate in the adminstration of justice enjoyed by the white population," 380 U. S., at 224, might violate the guarantees of equal protection. See *id.*, at 222–228. The Court felt that the important and historic purposes of the peremptory challenge were not furthered by the

exclusion of blacks "in case after case, whatever the circumstances, whatever the crime *and whoever the defendant or the victim may be." Id.*, at 223 (emphasis added). Nevertheless, the Court ultimately held that "the record in this case is not sufficient to demonstrate that th[is] rule has been violated . . . . Petitioner has the burden of proof and he has failed to carry it." *Id.*, at 224, 226. Three Justices dissented, arguing that the petitioner's evidentiary burden was satisfied by testimony that no black had ever served on a petit jury in the relevant county. See *id.*, at 228–247 (Goldberg, J., joined by Warren, C. J., and Douglas, J., dissenting).

Significantly, the *Swain* Court reached a very different conclusion with respect to the second kind of peremptory-challenge scenario. In Part II of its opinion, the Court held that the State's use of peremptory challenges to exclude blacks from a particular jury based on the assumption or belief that they would be more likely to favor a black defendant does not violate equal protection. *Id.*, at 209–222. JUSTICE WHITE, writing for the Court, explained:

> "While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a *real or imagined* partiality that is less easily designated or demonstrable. *Hayes* v. *Missouri*, 120 U. S. 68, 70 [1887]. It is often exercised upon the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another,' *Lewis* [v. *United States*, 146 U. S. 370,] 376 [1892], upon a juror's 'habits and associations,' *Hayes* v. *Missouri, supra*, at 70, or upon the feeling that 'the bare questioning [a juror's] indifference may sometimes provoke a resentment,' *Lewis, supra*, at 376. It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people

summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. . . . Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, *which may include their group affiliations*, in the context of the case to be tried.

With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory . . . ." *Id.*, at 220–222 (emphasis added; footnotes omitted).

At the beginning of Part III of the opinion, the *Swain* Court reiterated: "We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, *the particular defendant involved* and the particular crime charged." *Id.*, at 223 (emphasis added).

Even the *Swain* dissenters did not take issue with the majority's position that the Equal Protection Clause does not prohibit the State from using its peremptory challenges to exclude blacks based on the assumption or belief that they would be partial to a black defendant. The dissenters emphasized that their view concerning the evidentiary burden facing a defendant who alleges an equal protection claim based on the State's use of peremptory challenges "would

[not] mean that where systematic exclusion of Negroes from jury service has not been shown, a prosecutor's motives are subject to question or judicial inquiry when he excludes Negroes or any other group from sitting on a jury *in a particular case.*" *Id.,* at 245 (Goldberg, J., dissenting) (emphasis added).

The Court today asserts, however, that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely . . . on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Ante,* at 89. Later, in discussing the State's need to establish a nondiscriminatory basis for striking blacks from the jury, the Court states that "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Ante,* at 97. Neither of these statements has anything to do with the "evidentiary burden" necessary to establish an equal protection claim in this context, and both statements are directly contrary to the view of the Equal Protection Clause shared by the majority and the dissenters in *Swain.* Yet the Court in the instant case offers absolutely no analysis in support of its decision to overrule *Swain* in this regard, and in fact does not discuss Part II of the *Swain* opinion at all.

I cannot subscribe to the Court's unprecedented use of the Equal Protection Clause to restrict the historic scope of the peremptory challenge, which has been described as "a necessary part of trial by jury." *Swain,* 380 U. S., at 219. In my view, there is simply nothing "unequal" about the State's using its peremptory challenges to strike blacks from the jury in cases involving black defendants, so long as such challenges are also used to exclude whites in cases involving white defendants, Hispanics in cases involving Hispanic defendants, Asians in cases involving Asian defendants, and so

on. This case-specific use of peremptory challenges by the State does not single out blacks, or members of any other race for that matter, for discriminatory treatment.[1] Such use of peremptories is at best based upon seat-of-the-pants instincts, which are undoubtedly crudely stereotypical and may in many cases be hopelessly mistaken. But as long as they are applied across-the-board to jurors of all races and nationalities, I do not see—and the Court most certainly has not explained—how their use violates the Equal Protection Clause.

Nor does such use of peremptory challenges by the State infringe upon any other constitutional interests. The Court does not suggest that exclusion of blacks from the jury through the State's use of peremptory challenges results in a violation of either the fair-cross-section or impartiality component of the Sixth Amendment. See *ante*, at 84–85, n. 4. And because the case-specific use of peremptory challenges by the State does not deny blacks the right to serve as jurors in cases involving nonblack defendants, it harms neither the excluded jurors nor the remainder of the community. See *ante*, at 87–88.

The use of group affiliations, such as age, race, or occupation, as a "proxy" for potential juror partiality, based on the assumption or belief that members of one group are more likely to favor defendants who belong to the same group, has long been accepted as a legitimate basis for the State's exercise of peremptory challenges. See *Swain, supra; United States* v. *Leslie*, 783 F. 2d 541 (CA5 1986) (en banc); *United States* v. *Carter*, 528 F. 2d 844 (CA8 1975), cert. denied, 425 U. S. 961 (1976). Indeed, given the need for reasonable

---

[1] I note that the Court does not rely on the argument that, because there are fewer "minorities" in a given population than there are "majorities," the equal use of peremptory challenges against members of "majority" and "minority" racial groups has an unequal impact. The flaws in this argument are demonstrated in Judge Garwood's thoughtful opinion for the en banc Fifth Circuit in *United States* v. *Leslie*, 783 F. 2d 541, 558–561 (1986).

limitations on the time devoted to *voir dire*, the use of such "proxies" by both the State and the defendant[2] may be extremely useful in eliminating from the jury persons who might be biased in one way or another. The Court today holds that the State may not use its peremptory challenges to strike black prospective jurors on this basis without violating the Constitution. But I do not believe there is anything in the Equal Protection Clause, or any other constitutional provision, that justifies such a departure from the substantive holding contained in Part II of *Swain.* · Petitioner in the instant case failed to make a sufficient showing to overcome the presumption announced in *Swain* that the State's use of peremptory challenges was related to the context of the case. I would therefore affirm the judgment of the court below.

---

[2] See, *e. g., Commonwealth* v. *DiMatteo,* 12 Mass. App. 547, 427 N. E. 2d 754 (1981) (under State Constitution, trial judge properly rejected white defendant's attempted peremptory challenge of black prospective juror).