721 F.Supp. 1077 (1989)
UNITED STATES of America, Plaintiff,
v.
James Lamont JOHNSON, Defendant.
No. 88-58CR(3).
United States District Court, E.D. Missouri.
September 15, 1989.
*1078 James Martin, Asst. U.S. Atty., St. Louis, for plaintiff.
Phillip Morse, St. Louis, for defendant.

ORDER
HUNGATE, District Judge.
This cause was remanded to the district court with instructions to
hold a hearing to afford the Government the opportunity to explain the peremptory strikes in question of the two black veniremen. Johnson will then be given the opportunity to demonstrate that the Government's proffered reasons are pretextual.
United States v. Johnson, 873 F.2d 1137, 1140 (8th Cir.1989). The appellate court then instructed this Court to either grant a new trial if a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), violation were established, and otherwise to reinstate the conviction by entering a new judgment. Defendant's other claims were found to be without merit.
This Court conducted a hearing on July 27, 1989. Counsel for the government indicated the two jurors in question, Williams and Keys, numbers 10 and 28, were stricken because of information the government gleaned from material found in the questionnaires completed by the proposed jurors and made available to counsel. In particular, the government stated it had considered these two jurors' places of employment and observations of them during voir dire, aside from any statements made or not made by them during voir dire. The government also indicated that these were not the only jurors who had not spoken during voir dire and who were struck by the government.
Defendant asserts the government's proffered reasons remain pretextual, arguing that at the time the strikes were exercised, when asked why the government struck these black members of the panel, the government responded: "under our present 8th Circuit law, since I only struck two of five [blacks] ... I don't think I'm even required to give responses, because there hasn't been a preliminary showing of any prejudicial intent in the striking of two out of five black jurors."
There were five potential black jurors, and the government struck two, leaving three blacks on the panel. An issue was then raised as to whether one juror was white or black. If that juror were white, then there were four black jurors available, the government struck two, and two blacks remained on the panel. In any event, the lady whose race was in dispute as to whether she was white or black did not serve throughout the case because she was involved in an accident and an alternate was used in her place.
The transcript of the jury selection process at page 38, line 17, indicates defense counsel pointed out that "no black member of the panel answered any question any differently than any white member of the panel." At the July 27, 1989, hearing, the government pointed out that as to these two jurors, it was not a question of answering questions the same as white jurors, but that in fact they apparently had not answered any questions; and indeed, some white jurors likewise had not answered questions. This Court does not find the government's given reasons for exercising its strikes on blacks to have been pretextual. The government cited numbers remaining on the panel because it, and this Court, at that time, erroneously believed that was a sufficient addressing of the Batson problem. Under the present rulings, that clearly is not a sufficient addressing of Batson. Therefore, in accordance with the appellate court's instructions, the government was required to give its reasons for exercising peremptory strikes on the two black veniremen. The government did so, citing its objections to the jurors based on their employment. The Court does not find those stated reasons to *1079 be pretextual. They may be wrong. But this Court does not find they demonstrate an exercise of racial prejudice on the behalf of the government.
The defendant repeatedly advances the argument that citing numbers the first time, instead of the other reasons for exercising these two strikes, is enough to indicate a Batson violation. This Court believes a better analogy would be to someone who applies for a job without references and is employed. If the same person applies for a job and is advised that he cannot be employed without references, he may then furnish references and be employed. The fact that he did not furnish references in the first place is no proof that he cannot do so. Accordingly, the government's declining to give additional reasons when it believed racial arithmetic solved its problem does not mean that it cannot, as it now has done, supply a valid reason for the action taken. Defense counsel would dispute certain perceptions of the jurors entertained by the government. This is understandable. To one person the jar is half full, while the other party thinks it is half empty. Neither one is dishonorable in its view, although one may rush to fill a half empty jar while the other thinks nothing need be done if it is still half full.
If United States Attorneys, officers of the Court, state what the reasons were for which they exercised a strike, and if the Court is then to disbelieve them, we will be in a thorny quagmire. Indeed, if anyone believes United States Attorneys are lying to the Court about the reasons they give for the action they take, those who believe this to be true would seem to have an obligation to seek disciplinary action against such ethical malfeasance.
What weight shall we give the trial attorney's subjective impressions of jurors from both their verbal and non-verbal acts which the attorney has personally observed?
A man who practices law in the criminal courts should be able to tell something about a man by looking at his face. A large part of his work is sizing up judges, jurors, and witnesses at the first glance.
Clarence Darrow, "The Story of My Life," at 307 (1932).
Darrow said that he would be inclined to keep an Englishman on a jury because Englishmen come from a long tradition and do not fear to stand alone. An Irishman, he felt, would be emotional, kindly, forgiving: "His imagination will place him in the dark, where he will be simultaneously trying himself and thinking of reasons for letting himself off." Clarence Darrow was and is generally considered an advocate for the less privileged and those who seem to be the victims of discrimination in our society. Clarence Darrow certainly had preconceptions about jury selection. Where his clients were black, he wished to
rid the panel of jurors who might be antagonistic to black defendants. He did not want a fair jury, as he admitted: "... no one ever wanted a fair juror; at least, no lawyer ever did. The State wants a juror who has grown cold, serious, unimaginative, and, a Presbyterian, if possible. The lawyers for the defense want a man who is alert, witty, emotional, and who is a Catholic, or without any religious faith whatever." So he did his best to eliminate Presbyterians and succeeded pretty well.
He once told Judge Murphy privately
that he thought he had got a good jury. The judge asked why. "Well," Darrow replied, "six of them are Irish Catholics." Judge Murphy asked him whether he meant by that that Irish Catholics would not find a hanging verdict. "No, it isn't that," replied Darrow. "It's just that I never met an Irish Catholic yet who didn't think that someday he might be in trouble himself."
Darrow, A Biography, Kevin Tierney (1979).
In cases addressing the Batson problem,[1] the Eastern District of Missouri has *1080 been singled out for criticism for apparent insensitivity due to the large number of Batson appeals arising from here. The Batson case concerns black defendants and black veniremen. We have both in the Eastern District of Missouri, and therefore, the occasion may arise more frequently for defense counsel to raise this issue. By the same token, we have fewer cases involving Indian fishing rights than are found in Washington or Oregon. I expect we have fewer cases involving taconite than does Minnesota. This does not mean we are doing a better job on taconite or Indian fishing rights than those courts. It simply means the problem has less chance to arise here. Furthermore, the Eastern District of Missouri has one of the heavier trial dockets, which too would lead to a larger number of possibilities of appeals involving such issues. It is hard to raise a Batson issue without a black defendant and without blacks in the venire. We have several of both here, while other courts may not. The mere fact an issue is raised does not mean it is valid.
Those who study jury selection in the courts stress the importance of understanding non-verbal communication.[2] There is nothing new to most people about the idea that non-verbal cues are more of an indicator of a person's feelings and beliefs than verbal communication. Empirical studies and objective data have verified much of what was previously guessed at or intuitively felt. With a better understanding of non-verbal communication, more confidence in its reliability can be gained. Such an understanding of non-verbal communication is indispensible to careful and accurate decisions during jury selection.[3]
Non-verbal communicating factors are: body shape; hair; cosmetics; clothing and accessories; facial expression; posture, i.e., sitting on the edge of a chair, sitting up straight in a chair, sitting leaners, sitting with feet on the ground, seated listening position; items carried; gestures; eye contact; and smiles. Social scientists conclude that the face reveals what emotion an individual feels, and body language can show the intensity of that emotion.
Researchers and scholars tell us that not only are females more sensitive than males to non-verbal stimuli, but blacks also appear to be more sensitive than whites.[4] Researchers in a study in Boston found that blacks were more sensitive to the nonverbal messages not only from members of their own race but from whites as well.
Why this difference between females and males, or blacks and whites? No one knows for sure, although several different theories have been offered. It has been suggested that women may be more sensitive because motherhood requires non-verbal skills. They might be part of their genetic make-up, selected during the course of evolution. Or if the traditional requirements for motherhood are somehow learned, rather than in-born, this non-verbal sensitivity could be one of the learned abilities acquired at a very early age and in many cultures.
We have all heard the caveats: "beauty is only skin deep," and "you can't judge a book by its cover." However, research demonstrates that attractiveness helps people to be more persuasive, obtain higher salaries, look more credible, be seen as better marital partners, and be more desirable as friends. A great Missouri trial *1081 lawyer, the late G.C. Huston, is quoted as saying: "When I don't like a juror's looks, I figure he may not like mine, and therefore I do not select him."
In the book, "Anatomy of a Jury" by Seymour Wishman, the following is found:
A lawyer makes decisions on probabilities. A lawyer defending someone accused of murder would be interested to know that 44% of those between 18 and 24 oppose the death penalty, while only 27% of those over 50 oppose it.
Most people would agree that a dangerous felon is not entitled to a jury of dangerous felons. Does a young Korean have a right to expect a jury of young Koreans, or a percentage of young people, or of Koreans corresponding to the percentage in the community?
Mr. Wishman further recites that in England, King John signed a charter giving Jews on trial the right to have juries composed of equal numbers of Jews and Christians. Later statutes granted foreign merchants this right to mixed juries, de medietate linguae, composed half of native jurors and half of jurors speaking a defendant's native language, to encourage foreign merchants to do business in England.
In 1968, federal legislation replaced key men juror lists with voter lists.
Voter lists create their own biases. Less than three quarters of the people eligible to vote in 1984 were registered. In some states, the level is below 60%. Those who do register are not necessarily a random group. Whites, the middle-aged, and the better educated are over-represented; while non-whites, the poor, the young, the old, and the less educated are under-represented.
Some surveys have discovered that approximately 5% of the people do not vote in order to avoid jury duty.
Historically, the law has been based on the idea that challenges for cause are not enough to guarantee juries free from prejudice. Some jurors will refuse to reveal their true feelings or certain facts about themselves that might constitute grounds for challenge for cause. Others may not realize how their prejudices affect their objectivity. Here, the importance of body language can be seen.
The last thing a prosecutor and defense lawyer usually want is a truly random jury. Both want jurors they think favor their side. Some defense lawyers believe certain groups should be avoided in certain areas. For example, religious people in obscenity trials; wage earners in income tax prosecutions; West Indian blacks who feel superior to American blacks accused of involvement in the drug trade; and young, idealistic jurors in political corruption cases. Some defense lawyers excuse butchers because "the necessary forbearance or compassion for blood or pain could not be expected of them." For this very reason, butchers were ineligible under Jewish law to serve as jurors.
Some well-known and successful criminal defense lawyers have expressed views about jurors that to others may seem idiosyncratic, if not absurd. Percy Forman, one of the more successful, is leary of Germans, Russians, and others with a strong sense of law, order, and "tribal tradition." Louis Nizer has said he is suspicious of prospective jurors with beards or bow ties: "They're usually individualists who will try to win a jury over to their view."
While, with good cause, many are skeptical of the ability of lawyers to pick "favorable jurors," in the 1972 trial of Angela Davis, ten of the jurors attended her victory party after the acquittal.
The more common stereotypes relied on by prosecutors include men, Republicans, the prosperous, bankers, engineers, and accountants; defense lawyers generally favor women, Democrats, poorer people, social scientists, and minorities.
Lawyers have been known to hire experts in body language to sit with them at counsel table to interpret what they see in prospective jurors being selected.
Those who believe the Batson rulings assuring defendants a larger number of blacks on juries will be an aid to the defense, may ignore the fact that the victims of urban crime are usually black, and there is probably no group more eager to punish *1082 the guilty than urban blacks. White jurors, unfamiliar with ghetto language or ghetto ways, are more likely to be taken in by a black defendant who is "jiving" them. Still, prosecutors may be correct in believing some black jurors will be less likely to return a conviction against a black because of a feeling of brotherhood.
Can discrimination be acceptable in certain cases? If a Nazi is accused of desecrating a synagogue, should the Nazi's lawyer be blamed for preferring a jury free of Jews?
Many lawyers are not primarily interested in society's problems in general, but are concerned with their client's rights in particular. Perhaps that is as it should be. H.L. Mencken wrote that:
It is the professional aim and function of the lawyers "not to get at the truth," but simply to carry on combats between ancient rules.
Having recently concluded a criminal trial with three black defendants and four blacks on the jury, in which a verdict was promptly returned finding each of these defendants guilty on from one to three counts; and if a page of experience is worth a pound of logic, at least one older judge finds it difficult to accept the Batson theories without a grain of salt  or better yet, a dose of salts.
After consideration, and having found the government's reasons sufficient and not pretextual,
IT IS HEREBY ORDERED that the conviction is reinstated and defendant shall appear on Friday, October 20th, 1989, at 10:00 a.m. for reimposition of sentence in accordance with the original judgment.
NOTES
[1] Two circuits have recently extended the Batson principle to civil cases, holding that equal protection forbids the exercise of peremptory challenges on racial grounds by a private litigant in a federal civil trial. Edmonson v. Leesville Concrete Co., 860 F.2d 1308, 1314 (5th Cir. 1988); Fludd v. Dykes, 863 F.2d 822, 829 (11th Cir.1989).
[2] "Jury Selection, An Attorney's Guide to Jury Law and Methods," by V. Hale Starr and Mark McCormick, published 1985 by Little, Brown & Company.
[3] The May 1, 1989, edition of the Illinois State Bar Association's The Bar News, mentions a "law ed series" entitled "Jury Selection: Don't Bore Them. They are a Captive Audience During Voir Dire But in the End They Will Judge Your Case. Non-Verbal Communications of the Jury. Body Language: How to read a perspective juror like a book. Signs & Symptoms  What do they tell you about the juror? Can these be misleading? J. Neil Boyle & Nancy A. Boyle Charter, Ltd., Chicago, Teachers/Actors."
[4] Assuming researchers and scholars are correct, while conceding some pedants confuse being notable with being not able or decide that since roses smell better than cabbages, they will make better soup.