J-A24004-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
FRANK M. GESUALSO :
:
Appellant : No. 1441 EDA 2017

Appeal from the Judgment of Sentence Entered December 16, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001217-2015,
CP-51-CR-0001228-2015

BEFORE: BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 21, 2020**

Appellant, Frank M. Gesualso, appeals from the judgment of sentence of an aggregate term of two to four years' incarceration, followed by two years' probation, imposed after he was convicted, in two separate cases, of various offenses, including robbery and conspiracy. On appeal, Appellant challenges, *inter alia*, the trial court's refusal to strike a juror for cause (hereinafter, "Juror #2"), who he claims did not have an adequate understanding of the English language. After careful review, we agree with Appellant that the court erred and, thus, we vacate his judgment of sentence and remand for a new trial.

The trial court summarized the facts adduced at Appellant's jury trial, as follows:

> On August 17, 2014, at approximately 1:15 p.m.,
> Philadelphia Police Officer Chanta Ung responded to a report of a

_____

[*] Retired Senior Judge assigned to the Superior Court.

robbery in progress at the Radio Shack at 330 Oregon Avenue. A white male with blue eyes and blond hair wearing a black Nirvana shirt and black shorts, later identified as Matthew Velykis, had entered the store with a black handled knife and began stuffing expensive merchandise into his pants. During this time, Radio Shack employee Willie Jordan also witnessed Velykis using the knife to cut certain items. Jordan called the police. Velykis then walked up to the register with two inexpensive items, pointed the knife at Jordan, and threw a $20 bill on the counter. Velykis then ran outside to a maroon Plymouth Grand Voyager minivan. As Velykis left the store, Cassidy Hopper, another employee, told him that she would not call the police if he left the merchandise. Hopper also stated that she had the license plate of the minivan. Velykis responded that it did[] [not] matter because it was stolen. Velykis then entered the minivan and veered it in Hopper's direction, causing her to back into the store. Velykis backed up and pulled away. Hopper observed a white male with light hair in a white shirt (later identified as … Appellant) seated in the passenger seat.

At about 2:30 p.m., Peter Hager, an Asset Protection Specialist at the Home Depot located at 1651 South Christopher Columbus Boulevard, observed Velykis putting expensive, "high-theft" merchandise into several tool and tote bags. He followed Velykis as he walked past the register with the bags in a cart and attempted to stop him. When confronted, Velykis ran into the parking lot and began shouting. The maroon Plymouth minivan pulled up and Velykis yelled at the driver to open the hatchback. The driver replied[,] "I can't, it won't open, it's broken." Whenever Hager approached the minivan, Velykis raised his fists into a fighting position. When Velykis took one of the tote bags from the cart and entered the passenger side of the minivan, Hager retrieved the rest of the stolen merchandise.

Hager then saw a short-haired white male in a white shirt drive out of the parking lot onto Columbus Boulevard. While speaking on the phone with the police, Hager ran to the shopping center intersection to further observe the minivan. As Hager got closer to the intersection, Velykis [was now outside the van, but he was] approach[ing] the passenger door [to get back into] the minivan. Velykis then charged at Hager with his fists up. After Velykis struck Hager several times in the head and arms, Hager fell, injuring his arm. When Hager got up, his cell phone was missing. … [M]eanwhile, the minivan left the location.

At about 3:00 p.m., Police Officers Melissa Kromchad and Joseph McDonnell investigated the robbery at the Home Depot. While en route, they saw a maroon Plymouth Voyager matching the description of the getaway minivan going northbound on Columbus Boulevard. The officers stopped the minivan, and as Kromchad approached the vehicle, she observed two occupants. Officer Kromchad identified … Appellant as the driver, and Velykis as the passenger. As the officers got closer, … Appellant drove off. The officers then pursued the vehicle through South Philadelphia. When attempting to turn onto Washington Avenue from Water Street, … Appellant sideswiped a gold 1998 Chevy Venture and continued westbound. [After f]ollowing the minivan [for] several blocks, the officers discontinued their pursuit because children were in the area.

At about 5:00 p.m., Officers Tyhara Burnett and Christian Hatcher stopped a Plymouth Voyager matching the description of the minivan on Essington Avenue. As Burnett approached the minivan, the driver fled[, driving erratically at a high rate of speed. The officers were directed by dispatch to terminate the pursuit due to safety concerns in the residential neighborhood.]

Officers Kromchad and McDonnell later joined a multiple vehicle pursuit at 16th and Porter Street[s]. The officers pursued the minivan east on Porter, then north on 13th Street. The driver attempted to turn eastbound on Daly Street, but the minivan hit the curb and blew a tire. Both men jumped out and ran eastbound on Daly Street before splitting up and running opposite directions down 12th Street. Officer Donnell continued the pursuit in his patrol vehicle and arrested … Appellant at 12th and Wolf Streets.

After arresting … Appellant, the police recovered a black iPhone from his front pants pocket. This phone belonged to Peter Hager. Police later recovered stolen merchandise from Radio Shack and Home Depot from the back of the minivan. When the police later transported Cassidy Hopper to Methodist Hospital, she identified Matthew Velykis as one of the perpetrators. She later identified … Appellant at 12th and Wolf Street[s].

Trial Court Opinion (TCO), 4/12/18, at 3-6 (footnotes and citations to the record omitted).

Appellant was ultimately charged in two separate cases, one pertaining to the Radio Shack robbery and the other to the robbery of Home Depot. The cases were consolidated, and Appellant's trial commenced in August of 2016. At the close thereof, the jury convicted Appellant of two counts of robbery and conspiracy to commit robbery, as well as single counts of fleeing or attempting to elude police, possessing an instrument of crime (PIC), and recklessly endangering another person (REAP). On December 16, 2016, Appellant was sentenced to an aggregate term of two to four years' incarceration, followed by two years' probation. He filed a timely post-sentence motion, which was denied by operation of law on May 3, 2017. That same day, Appellant filed a timely notice of appeal.[1] He also complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed its opinion on April 12, 2018.

Herein, Appellant states three issues for our review, which we have reordered for ease of disposition:

> [1]. Was not the evidence insufficient as a matter of law to find [A]ppellant guilty beyond a reasonable doubt of robbery on Docket No. CP-51-CR-0001228-2015 (the Radio Shack incident) where [A]ppellant did nothing more than sit in a vehicle outside the

---

[1] Appellant filed a single notice of appeal listing both docket numbers of his two underlying cases. We recognize that our Supreme Court has held that "the proper practice under [Pa.R.A.P.] 341(a) is to file separate appeals from an order that resolves issues arising on more than one docket. The failure to do so requires the appellate court to quash the appeal." ***Commonwealth v. Walker***, 185 A.3d 969, 977 (Pa. 2018). The Court tempered its holding, however, by making it prospective only. The ***Walker*** opinion was filed on June 1, 2018; hence, ***Walker*** is not applicable in the instant matter, as Appellant filed his notice of appeal on May 3, 2017.

location of the robbery, where there was no evidence that [A]ppellant had prior knowledge of the robbery being planned, and where no proceeds of that robbery were recovered from [A]ppellant?

[2]. Did not the trial court err as a matter of law, undermine the judicial function and violate [A]ppellant's constitutional rights to equal protection and a fair trial when it refused to dismiss for cause a prospective juror who both the prosecution and defense agreed had such difficulty comprehending English that she could not fulfill the functions of a juror and then forced the defense to use a strike and where all the defense strikes were exhausted prior to the end of the trial[?]

[3]. Did not the trial court err as a matter of law, undermine the judicial function and violate [A]ppellant's constitutional rights to equal protection and a fair trial when it denied or ignored defense challenges pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), where the defense made a *prima facie* showing that the Commonwealth made several peremptory challenges on the basis of race, and the Commonwealth failed to offer sufficient race-neutral bases for striking the venire persons in question?

Appellant's Brief at 4-5.

Appellant first challenges the sufficiency of the evidence to sustain his conviction of robbery premised on the Radio Shack incident. According to Appellant, he was merely "seated in the passenger side of a van that was parked outside the Radio Shack when another person robbed that store's personnel, left, and drove off in the van." *Id.* at 48. He insists that his presence at the scene of the robbery was insufficient to prove that he "knew of the plan to rob the Radio Shack, or [that he] could observe what transpired in the store." *Id.* at 49.

Appellant's argument is unconvincing. Initially, we note that,

[t]he standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient

- 5 -

evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1014 (Pa. Super. 2002) (citations and quotation marks omitted).

In this case, the jury could reasonably infer that Appellant was acting as a co-conspirator and/or accomplice in the Radio Shack robbery based on the circumstances of the second robbery at Home Depot. Specifically, 45 minutes after Velykis robbed the Radio Shack, he entered the Home Depot while Appellant remained outside in the van. When Velykis exited the Home Depot, Appellant drove him away from the scene, and then fled when the police attempted to stop the vehicle. Once Appellant was apprehended, he was discovered to be in possession of Hager's phone, which Hager had lost during his confrontation with Velykis. Moreover, items from both the Radio Shack and Home Depot stores were found in the van that Appellant had been driving.

Clearly, the evidence was sufficient to demonstrate that Appellant acted as a co-conspirator/accomplice in the robbery of the Home Depot. Because that robbery occurred so soon after the Radio Shack robbery, and mirrored the Radio Shack robbery in that Velykis entered while Appellant remained outside, it was reasonable for the jury to infer that Appellant conspired with and/or aided Velykis in committing the Radio Shack robbery. While Appellant did not drive the van away from the Radio Shack, we agree with the Commonwealth that his actions during the subsequent Home Depot robbery were sufficient to establish that he knew Velykis was robbing the Radio Shack, and that he assisted Velykis in doing so by acting as a 'lookout' outside.

We also agree with the Commonwealth that the facts before us are distinguishable from the 'mere presence' cases on which Appellant relies. For instance, in ***Commonwealth v. Keblitis***, 456 A.2d 149 (Pa. 1983), our Supreme Court held that the evidence was insufficient to support Keblitis's conviction of manufacturing marijuana, where marijuana plants were recovered from a garden in which she was "performing general gardening duties, but not amongst the mari[j]uana." ***Id.*** at 151. In ***Commonwealth v. Garrett***, 222 A.2d 902, 904-05 (Pa. 1966), our Supreme Court concluded that the evidence failed to sustain Garrett's robbery conviction, where the victim only testified that four men were in the area when he was knocked unconscious and robbed, and aside from Garrett's admission that he was among the group, no other evidence established his participation in the robbery. Finally, in ***Commonwealth v. Finley***, 383 A.2d 1259, 1260 (Pa.

1978), the Court determined that the evidence failed to prove that Finley acted as a lookout during a robbery and murder, where there was no evidence that Finley had been waiting for his co-defendant to come out of the victim's home, or that he was outside the home for any length of time.

In this case, if we were examining the evidence regarding the Radio Shack robbery alone, the cases on which Appellant relies would be more persuasive. However, the Commonwealth's evidence establishing Appellant's participation in the nearly-identical robbery of the Home Depot shortly after the robbery at the Radio Shack distinguishes his case from ***Keblitis***, ***Garrett***, and ***Finley***. Accordingly, Appellant's challenge to the sufficiency of the evidence is meritless.

Next, Appellant contends that the trial court erred by refusing to strike Juror #2, who he claims had difficulty understanding English. Appellant explains that,

> [o]n the first day of *voir dire*, August 17, 2016, both the defense and the prosecution expressed concern about Juror #2's ability to understand English and the defense made a challenge for cause[.] (N.T.[,] 8/17/16, 29-39). When the judge questioned the prospective juror, her answers revealed that she lacked understanding of the questions. She answered "yes" more than once to questions which would call for a "no[," for example:]
>
>> THE COURT: All right. And is there anything about the allegations or the charges […] that would prevent you from evaluating the evidence in a way that's fair to both sides?
>>
>> A. Yes.
>>
>> THE COURT: Is there anything about the allegations and the charges that I told you about that would prevent you from evaluating the evidence in a fair way to both sides?

A. Yes.

N.T.[,] 8/17/16, 3[0]….[2]

When asked the section of the city in which she lived and told not to give a specific address, she proceeded to give her specific address. [*Id.* at 29.] When questioned about her partially blank questionnaire, she said she was sleeping.[3] [*Id.* at 32.] When asked if English was her first language, she did not answer yes or no, but [stated] what was apparently the name of the [Filipino] language she spoke. [*Id.* at 33.] When asked where else in the city she had lived, she answered "Pangasinan[,"] obviously a non-responsive answer, referring to a [location] in the Phillipines. [*Id.* at 34.] Eventually, she corrected her original statement that she came to the United States and joined the army, by saying that in fact, she did not pass the [interview portion of the] test…. [*Id.* at 35.] It was clear that her command of the nuances of the language was sorely lacking. … Even after the assistant district attorney joined defense counsel to argue that she should not be seated due to her language deficit, [*id.* at 38,] the court refused to allow the challenge for cause and told counsel that,

> THE COURT: Okay. Yeah, I probably am not going to strike her. I wish it could be a perfect situation when we have, you know, the jurors, but the standard is whether or not the person can be fair and impartial. She did mention that she was sleeping, I think in the other room, but I further asked her and drilled her about at what point she was sleeping, and I didn't get the impression that she answered this questionnaire -- wasn't honest when she answered the questionnaire. But, you know, certainly if either of you want to strike her, I have no issue with that at all.

[*Id.* at] 38-39.

---

[2] The court followed these questions by asking Juror #2, "Do you believe you could be a fair and impartial juror?" N.T., 8/17/16, at 31. Juror #2 replied, "Yes." *Id.*

[3] We discuss Juror #2's explanation for only partially filling out the written questionnaire *infra*.

Because it was the defense['s] turn, counsel used a peremptory challenge. When the court [then] attempted to [again] explain its position [for not striking the juror], it said,

THE COURT: She's been in this country for 24 years, she's served in the Army, I mean -

[Defense Counsel]: Maybe.

[Asst. District Attorney]: She said she didn't pass the test.

THE COURT: What?

[Defense Counsel]: She didn't pass the test, so she actually didn't ever serve.

THE COURT: Okay. She did say that, yeah. But either way, you've struck her.

[*Id.* at] 39….

Appellant's Brief at 18-20 (emphasis and footnote omitted).

Appellant contends that this record makes clear that Juror #2 could not sufficiently understand English to qualify for jury service and, therefore, the trial court erred by not striking her for cause. Notably, the Commonwealth concedes that Juror #2 should have been stricken. *See* Commonwealth's Brief at 9-13. In support, it relies on the questionable responses by Juror #2 during the *voir dire*, as well as the fact that the juror failed to complete the written questionnaire, which "suggested that she had a limited grasp of English." *Id.* at 11. Additionally, both Appellant and the Commonwealth agree that Appellant was prejudiced by the court's error in not striking this juror, as Appellant exhausted his remaining peremptory challenges. *See id.* at 12; Appellant's Brief at 22 (citing, *inter alia*, *Commonwealth v. Johnson*, 445 A.2d 509, 514 (Pa. Super. 1982) ("Where, as here, a defendant is forced to use one of his peremptory challenges to excuse a prospective juror who should

have been excused for cause, and then exhausts his peremptories before the jury is seated, a new trial will be granted.") (citations omitted)).

We agree with Appellant and the Commonwealth. While the trial court concludes that "the prospective juror was able to understand and answer all follow-up questions[,]" TCO at 23, our review of the record belies this claim. The *voir dire* of Juror #2 supports Appellant's insistence that she "had a tenuous grasp on the English language[,]" which was especially problematic in this case, as "it was essential that the jurors be able to follow the … testimony and the complicated instructions on conspiracy and vicarious liability - the core issues for [A]ppellant…." Appellant's Brief at 21. Moreover, Juror #2's failure to complete the written questionnaire further demonstrated her incomprehension. When asked to explain her partially-filled out questionnaire, she responded:

> [Defense Counsel:] Good afternoon, ma'am. I'm sorry. We have your sheets, but mine is not all filled out.
>
> [Juror #2:] Yeah, because I'm sleeping.
>
> …
>
> THE COURT: Sleeping where?
>
> [Juror #2:] In the lobby.
>
> THE COURT: Okay.
>
> …
>
> [B]ut you had the opportunity to look at this form, right?
>
> [Juror #2:] Yes.

THE COURT: And you didn't put any checkmarks in any of the "yes" boxes. You were able to read all the questions and understand them?

[Juror #2:] Yes.

THE COURT: And this is a fair and accurate description of what your answers are?

[Juror #2:] Yes.

THE COURT: All right. **So it was your intent not to put any checkmarks in the "yes" box, right?**

[Juror #2:] **No.**

THE COURT: All right. But this is an honest and fair reflection of what your answers are?

[Juror #2:] Yes.

THE COURT: All right.

N.T., 8/17/16, at 31-33 (emphasis added).

It is apparent that Juror #2 either did not understand the questions on the written form, or did not comprehend the questions being asked of her at the oral *voir dire*. Either inability would constitute cause to strike her, as a citizen may not serve as a juror if they are "unable to read, write, speak and understand the English language[.]" 42 Pa.C.S. § 4502(a)(1). The trial court's focus on the fact that the juror "believed she could be fair and impartial" is not sufficient to overcome the juror's disqualification based on her language impediment. TCO at 24. Thus, the court erred by not striking Juror #2 for cause. That error prejudiced Appellant because he was forced to use a peremptory challenge to strike Juror #2, and he exhausted his

remaining peremptory challenges.  Accordingly, a new trial is required.  ***See***

***Johnson, supra***.[4]

Judgment of sentence vacated.  Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/21/20

---

[4] Given this disposition, we need not address Appellant's third issue.

- 13 -